## Wytheville.

### GEORGE CLIFFORD BISHOP, AN INFANT v. THOMAS LORAIN WEBSTER.

June 12, 1930.

Absent, Campbell and Epes, JJ.

The opinion states the case.

*Wendenburg & Haddon* and *Denny & Valentine*, for the plaintiff in error.

*Gordon B. Ambler* and *Leon M. Bazile*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This writ of error is to a final judgment on the verdict of the jury in the Circuit Court of Henrico county. The declaration charged that the defendant, plaintiff in error here, on the 23rd day of September, 1926,

"debauched, seduced and carnally knew" Margaret Elizabeth Webster, an infant daughter of the defendant in error. The defendant, an infant, by his guardian *ad litem* plead the general issue.

It appears that Miss Webster, was, on September 23, 1926, the seventeen year old daughter of the defendant in error, T. L. Webster, and lived with her parents at Longdale, in Henrico county; that the plaintiff in error was, on the same date, the nineteen year old son of the Rev. George M. Bishop, pastor of the Methodist Church, of which both the plaintiff and his daughter were members; that on June 10, 1927, Miss Webster gave birth to a child, and claimed that the plaintiff in error was the father, and that the seduction occurred on the night of September 23, 1926. In February, 1927, Miss Webster, or a member of her family, swore out a criminal warrant charging the plaintiff in error with contributing to her moral delinquency, which warrant was dismissed on the hearing before the trial justice; subsequently the civil action now under review was instituted, resulting in a verdict and judgment for $10,000.00 in favor of the defendant in error.

There are seven assignments of error. Five to the action of the court in admitting and rejecting evidence; sixth, that the verdict is excessive; seventh, the refusal of the court to grant a new trial on the ground of after discovered evidence.

The first two assignments of error are to the refusal of the trial court to permit Miss Webster, on cross-examination, to answer the following questions:

"Q. When you tried to prosecute this boy, in view of everything that you have said here about there being an intention and talk of marriage, and that you were a virtuous girl until the night of September 23rd, did you swear out any warrant, or did any of your people swear out any warrant, against him, charging him with

seduction under promise of marriage?" The answer, not in the presence of the jury, was "no."

"Q. Is it not a fact that the charge that has been spoken of here in this case against this boy, which was tried before Judge Pitt, the trial justice of this county, was that he had contributed to your moral delinquency, you being under the age of eighteen years; and is it not a further fact that in that trial you said not one word about your having any understanding, or about anything having been said by him, about marriage, but on the contrary you denied that there was anything said about marriage?"

To this question the court made the following ruling:

"I exclude the first part of the question but I admit the second part. I admit the part that asks whether she said down there that there was no promise of marriage."

■■ The answer to the first part of the second question was "yes." The defendant in error contends that this ruling was correct because a judgment of conviction, or acquittal, in a criminal prosecution is not relevant, in a civil action, for the same act, and cites numerous authorities in support thereof, to all of which we agree. The chief reasons for the rule are that the parties are different, and the degrees of proof in the two proceedings are not the same. The relevancy of the evidence offered, however, does not rest on this principle, but on the question of when seduction became important in the minds of the defendant in error and Miss Webster, and why did the Websters elect to prosecute for a misdemeanor and later make the charge of seduction? Their explanation may have been entirely satisfactory. A criminal charge of seduction on a promise of marriage requires corroboration of the prosecutrix. The delay in making the charge may not have been satisfactorily explained.

It was a legitimate subject of cross-examination and

the answers should have been allowed in the presence
of the jury, not whether or not the plaintiff in error was
convicted or acquitted, but in order that the jury might
know that there had been two different charges lodged
against the plaintiff in error. The case of the de-
fendant in error was not dependent upon the proof of
seduction under the promise of marriage. It did, how-
ever, affect his case on the *quantum* of damages. Inas-
much as the evidence was later presented to the jury,
this does not constitute reversible error.

The third assignment of error is to the action of
the court in permitting Mrs. Hernon to testify, in
rebuttal, that she had seen Miss Webster sitting in an
automobile in front of a drug store near Brookland
Theatre, in the city of Richmond, and the plaintiff in
error go into the drug store, on the night of September
23rd. Miss Webster had testified, on her examination
in chief, that she and the plaintiff in error had turned
down Brookland Park boulevard from Chamberlayne
avenue, stopped at this drug store, and then gone to
Stuart Monument, a mile and one-half from Solomon's
store, where the intercourse took place, while the
plaintiff in error had testified that they went straight
out Chamberlayne avenue to Miss Webster's home
without stopping or getting out of the car, and denied
going nearer the drug store or Brookland Theatre than
Chamberlayne avenue. The testimony of Mrs. Her-
non could well have been introduced as a part of the
evidence in chief of defendant in error. But it was
also in direct contradiction of the testimony of plaintiff
in error. Hence, there was no error in permitting the
same to be introduced when it was offered.

The fourth error assigned is to the action of the
court in refusing to delay the trial until counsel could
summon the manager of the Brookland Theatre, as a
witness to contradict Mrs. Hernon on the time she

left the theatre on the night in question. She had testified that she left the theatre shortly after ten o'clock and before the result of the Dempsey-Tunney fight was announced there. The evidence of both parties fixed the time they left Richmond some time after ten o'clock. It is claimed that the manager of the theatre would have testified that the announcement of the fight was made in his theatre about 9:30 o'clock. The record shows that this exception was raised in the following manner:

"And after both sides had announced they had closed their testimony, the court adjourned over until Monday morning, April 30th. When the court convened on Monday morning, and before the instructions were read to the jury, counsel for the defendant informed the court that since the above witness had testified they had discovered and important witness, who was the manager of the Brookland Theatre, who would testify that the announcement of the result of the Dempsey-Tunney fight was thrown on the screen in the Brookland Theatre, on the night of September 23, 1926, about 9:30 p. m., but the court refused to allow the defendant to introduce this witness, to contradict the evidence given by the witness, Mrs. Hernon. To the ruling of the court in refusing this witness, who is the manager of the Brookland Theatre, to testify, the defendant excepted."

It does not affirmatively appear that the witness was produced and ready to testify. It appears, or rather the only inference on the subject is, that the court was asked to delay the proceedings until this witness could be summoned or otherwise directed to come to the courthouse to testify. Questions of this nature are left largely in the discretion of the trial court, and unless it affirmatively appears that this discretion has been abused, this court will not disturb the trial court's ruling thereon.

██ ██ The fifth error assigned is to the ruling of the court in permitting the following evidence to be presented to the jury:

"Q. Miss Webster, is that your baby?

"A. Yes, sir.

"Q. Hold it so that the jury can see it; hold it so that its face is upwards towards the jury?"

Note: Witness so holds the baby.

"Q. Will you point out to the jury the marks of similarity between the baby and defendant here?

"Mr. Wendenburg: We object to that, if your Honor please. Let the child be exhibited and not let the witness point out anything.

"A. She has a hand like him.

"Q. How about the chin?

"A. The chin is like him I think, and her eyes, as you can see set, out like his. She has a broad head through here (indicating) like his; she has blue eyes like he has.

"Q. Now, Miss Webster, you can take the baby back."

The objection here raised, however, is not to the exhibition of the child, but to the mother pointing out the physical likeness of the child to the alleged parent. This question seems to be one of first impression in the State. That there is an irreconcilable conflict of authority upon the admissibility of evidence of this nature is freely conceded by counsel on both sides.

In *Watkins* v. *Carlton*, 10 Leigh (37 Va.) 560, it was held that the evidence showing dissimilarity of a child claimed to be a mulatto to a white man, the husband of its mother, was proper evidence. This ruling is in line with the universal rule where race or color is involved. In some States the exhibition of the child, or any testimony to the resemblance, is prohibited on the ground that such evidence is "neither accurate nor reliable." *Bilkovie* v. *Loeb*, 156 App. Div. 719, 141

N. Y. S. 279; *Gray* v. *State*, 43 Tex. Cr. R. 300, 65 S. W. 375; *Barnes* v. *State*, 37 Tex. Cr. R. 320, 39 S. W. 684; *State* v. *Neel*, 23 Utah 541, 65 Pac. 494; *State* v. *Danforth*, 48 Iowa 43, 30 Am. Rep. 387. Or that "resemblances are frequently imagined," a mere matter of "notion, fancy or guess work and ought (not) to be given the slightest weight in determining an issue fraught with such grave consequences." *State of Iowa* v. *Harvey*, 112 Iowa, 416, 84 N. W. 535, 536, 52 L. R. A. 500, 84 Am. St. Rep. 350. Other cases opposed to such exhibition are: *Clark* v. *Bradstreet*, 80 Me. 454, 15 Atl. 56, 6 Am. St. Rep. 221; *Risk* v. *State*, 19 Ind. 152; *Reitz* v. *State*, 33 Ind. 187; *Ingram* v. *State*, 24 Neb. 33, 37 N. W. 943. In *Jordon* v. *Commonwealth*, 180 Ky. 379, 202 S. W. 896, 897, 1 A. L. R. 617, such an exhibition was excluded because it was "of a very dangerous and probably highly injurious character." Yet, the court in the same opinion stated that it was not error to permit the child to remain in the court room with its mother, in the presence of the jury, while the trial was in progress, but no inquiry could be made of its parentage nor would the Commonwealth's attorney be permitted to refer thereto in his argument.

There is another line of cases holding that after some evidence, pointing out particular or specific resemblances between the child and the putative father has been introduced, then the child is admissible in evidence for comparison by the jury of those traits of similarity only. *State* v. *Anderson*, 63 Utah, 171, 224 Pac. 442, 40 A. L. R. 94. If the child is once exhibited to the jury for comparison and the putative father is present, as is usually the case, what is to prevent the jury from making other comparisons not specifically enumerated? What good reason can be advanced for so limiting the jury?

There is still a third line of authorities which hold that whether or not the exhibition of the child should

be allowed for purposes of comparison depends upon the age of the child. The argument advanced in support of such decisions is founded upon the alleged physiological fact that during the first few weeks or even months of the child's existence, the features are immature, and as it grows older changes very much in likeness and appearance. A child nine months old has been held too immature to be exhibited for purposes of comparison. *Hanawalt* v. *State*, 64 Wis. 84, 24 N. W. 489, 54 Am. Rep. 588; *State* v. *Harvey, supra.* And in the same court a child two years, one month old was allowed to be exhibited. *State* v. *Smith*, 54 Iowa, 104, 6 N. W. 153, 37 Am. Rep. 192. The objection based upon the immaturity of the child is more to the definiteness of the proof, or the weight to be given such evidence, than to its relevancy. All individuals do not develop by fixed rules. If they did, it might be possible to fix upon a certain age below which the child should not be exhibited as evidence. Whether the features of a child are sufficiently developed to authorize its use as evidence, by comparision with its alleged parents, is purely a question of fact which should be determined by the trial court before admitting the child. *State* v. *Danforth*, 73 N. H. 215, 60 Atl. 839, 111 Am. St. Rep. 600, 6 Ann. Cas. 557.

Lord Mansfield, in the *Douglas Peerage Case*, 2 Hargrave Coll. Jur. 386, said: "I have always considered likeness as an argument of a child being the son of a parent." Evidence of likeness whenever pertinent to the issue seems to be admitted in the English cours whether in the form of opinion evidence of lay witnesses (*Annesley* v. *Anglesea*, 17 How St. Tr. 1139) or demonstrative evidence of resemblance, 8 Am. L. Rev. (Eng. Court of Queen's Bench) 381.

Heath, J., in a later English case, said: "If the jury were convinced that resemblance did exist it was impossible to have stronger evidence."

■ In the instant case, an action by the father for loss of the services, expenses, etc., in taking care of his daughter while she was confined, the defendant stood upon his plea of not guilty. Hence, it became necessary for the father to prove his allegations by a preponderance of the evidence. To confine the defendant in error, on such an issue, to the testimony of witnesses, without permitting him to exhibit to the jury the fruits of the intercourse, and the living object for which the loss of services and the expenditures were incurred, would be depriving the defendant in error of the most convincing proof available. The mother, after exhibiting the baby to the jury, pointed out marks of similarity, the chin, the hand, the forehead. While the child was young, a little over ten months old, the marks of similarity pointed out by the mother could be seen by the jury and whether or not they existed was a fact to be taken into consideration by them only as tending to prove or disprove intercourse between the plaintiff in error and Miss Webster. There is no error in this assignment.

■ The seventh error assigned, and the one we will now consider, is based on the refusal of the trial court to set aside the judgment and verdict and grant |the plaintiff in error a new trial, on the ground of after-discovered evidence. The after-discovered evidence relied upon is contained in the affidavits of three ministers and a special police officer of Chesterfield county. The statements in the affidavits show the four were present at the criminal trial of the plaintiff in error, and heard Miss Webster say, on cross-examination, that she had never been engaged to marry the plaintiff in error; that he had never made any promise of marriage to her, and on the night of September 23, 1926, he made no promise of any kind. If this evidence had been given before the jury and they had believed the

same to be true, it would have served two purposes: One, to discredit Miss Webster, and (two), no recovery could have been had beyond compensation for the loss of services and reimbursement for incidental expenses. *Litton* v. *Woliver*, 126 Va. 32, 100 S. E. 827; *White* v. *Campbell*, 13 Gratt. (54 Va.) 573. Therefore, this evidence was not merely cumulative, corroborative or collateral, it was material but would not necessarily, on another trial, produce a different verdict, though it would have tended to reduce the amount of the verdict to compensatory damages only; nor did this evidence tend merely to impeach the character of a witness, it went to the merits on the *quantum* of damages.

■ The existence of this evidence, however, was not discovered after the trial. The plaintiff in error, his attorneys and his father were present during the whole of the criminal trial and knew Miss Webster's testimony. It is urged that evidence includes two things: (1) A fact, and (2), a person who can swear to that fact, or an instrumentality through which that fact can be established. There is no flaw in this reasoning and it was just as self-evident before as after the trial.

In the brief for the plaintiff in error, it is claimed that there was no occasion to think that Miss Webster would alter her testimony in this important respect, and that her testimony at the criminal hearing was neither material nor admissible until she had testified contrary thereto in the civil action; with which contention we agree. But this part of her testimony was very vital to the plaintiff in error on the *quantum* of damages. Hence, it must have made a strong impression upon him, his father and his counsel, the latter being the same in both cases. They, therefore, must or should have been on the alert to bring this fact out on the cross-examination of Miss Webster. The trial began April 26, 1928, and was adjourned from

Friday following until Monday, April 30th. Miss Webster was examined on April 26th and cross-examined the same day. The plaintiff in error, his father and counsel knew then exactly what her testimony was in this action. The three ministers who made affidavits were friends of the plaintiff in error. His excuse for not producing them during the trial was that there were more than forty Methodist ministers in the Richmond District of the Methodist Church. Not all of these ministers were present at the criminal trial. The plaintiff in error is a son of a minister, his father was active in his behalf, knew the forty ministers, and it seems reasonable to think that he knew his intimate friends among the forty and would know which of those were present during the criminal proceedings. With a little effort on his part he could have obtained these witnesses before the case was finally closed. Failure so to do shows want of due diligence which is fatal to the contention of plaintiff in error on this point.

The next assignment of error is based on the refusal of the court to set aside the verdict as excessive. The law furnishes no standard of measuring damages on the case made out by the defendant in error. In a civil action for seduction, by the parent, where there are no promises of marriage or deceptive arts employed, the recovery is limited to loss of services and reimbursement for incidental expenses. *White* v. *Campbell*, 13 Gratt. (54 Va.) 573; *Litton* v. *Woliver*, 126 Va. 32, 100 S. E. 827. But where such means are employed to accomplish seduction, the father of the infant seduced is permitted to recover not only compensatory damages, but punitive damages, or smart money. In the case at bar the plaintiff in error denied, not only that he made any promise, or used any of the deceptive arts, but that he had any sexual intercourse with Miss Web-

ster at all. Miss Webster's testimony to the contrary makes out a case wherein punitive damages are allowable. When the jury have been so instructed and their verdict returned, whether or not the award is inadequate or excessive is a legal question addressed to the sound discretion of the court to exercise its supervisory power over verdicts to prevent the gross miscarriage of justice.

The Chief Justice, in a personal injury action, *C. & O. Ry. Co.* v. *Arrington*, 126 Va. 194, 101 S. E. 415, at page 423, said: "In such a case as this, where the amount of the verdict is attacked because it is so unusual, it is proper to make comparisons with the verdicts which other juries have found in other cases for similar injuries; for, while each case must be determined by its own facts, it is nevertheless true that the verdicts of other juries, which have been approved by the courts, represent the common or average judgment of mankind as to the proper recovery in such cases. Of course, these verdicts show a very wide difference of opinion, growing out of the circumstances of the different cases."

The defendant in error cites eleven cases in his brief in which the sum allowed in actions of seduction varies from $650.00 to $25,000.00.

The case of *Marshall* v. *Taylor*, 98 Cal. 55, 32 Pac. 867, 35 Am. St. Rep. 144, one of the eleven mentioned above, in which the award of the jury was $25,000.00, was an action by the girl seduced against her employer, a married and wealthy man. The evidence showed that she was drunk from wine given her by the defendant at the time, and there were other aggravating circumstances.

In 52 L. R. A. (N. S.) 85, is a note wherein is cited numerous cases showing the amount of damages allowed in similar actions. In the twenty seven awards

there reviewed, the sums vary from $250.00 to $5,500.00. The average, however, is approximately $2,000.00.

In the case of *Luther* v. *Shaw*, 157 Wis. 234, 147 N. W. 18, 52 L. R. A. (N. S.) 85, a similar action to the one at bar, compensatory damages were fixed at $150.00 and exemplary $5,000.00. The trial court reduced the exemplary damages to $1,500.00, which action was sustained on appeal.

It was said in *C. & O. Ry. Co.* v. *Arrington, supra:* "No question is ever presented, either to a trial court or to an appellate court, more difficult of determination than this * * *. The question, then, should be approached by the courts with the greatest circumspection and with the keenest sense of responsibility for the due administration of justice."

The evidence in this case shows that the defendant in error paid $330.66 to nurses, hospitals, doctors and for other necessary bills incurred during the confinement of his daughter. No attempt was made to estimate the value of the loss of services, and it is hard to fix a specific sum covering loss of services under such circumstances.

In *Pendleton* v. *N. & W. R. Co.*, 82 W. Va. 270, 95 S. E. 941, 16 A. L. R. 761, it was held that the verdict was excessive because the exemplary damages exceeded the compensatory damages by nine or ten times. In the instant case nothing can eliminate the unfortunate facts brought about by the combined action of two mere youths. Both have to make a fresh start in life handicapped by the matter under review. To saddle a $10,000.00 judgment on the boy who fills only a minor position as clerk, with no expectancy of an inheritance, would mean financial ruin and would be too severe a punishment. This court is not unmindful of the unfortunate position in which the defendant in error finds himself, but our sympathy must not be allowed to con-

trol our sense of justice, nor prevent us from enforcing the rules of law, applicable to all alike. Upon a careful consideration of all the facts and circumstances of the case we have reached the conclusion that the verdict is excessive.

Under section 90 of the Constitution, as amended (see Acts 1928, chapter 205), we have no authority to increase or diminish a judgment in an action for unliquidated damages.

The judgment will, therefore, be reversed, the verdict of the jury set aside, and the case remanded for a new trial not in conflict with the views stated in this opinion.

*Reversed and remanded.*

UPON PETITION FOR REHEARING.

### Richmond.

November 13, 1930.

PER CURIAM:

In the opinion in this case, handed down by Hudgins, J., at Wytheville, June 12, 1930, 153 S. E. 837, at the end, there is this expression: "Under section 90 of the Constitution, as amended (see Acts 1928, chapter 205), we have no authority to increase or diminish a judgment in an action for unliquidated damages." This clause, just quoted, is stricken from the opinion. It is unnecessary in this case to construe section 90 of the Constitution (1902), as amended (see Acts 1928, chapter 205). The clause is stricken out lest it be misconstrued (as it already has been) as indicating that any member of this court is of opinion that the power long exercised by this and all other courts to put the plaintiff upon terms, and to allow him the option of waiving a portion of his damages or have a new trial, is in the slightest degree affected or diminished by that section of the Constitution.

*Petition for rehearing denied.*