# The Gazette, Inc.

### v.

## James William Harris, et al.

Record No. 830758

## Charlottesville Newspapers, Inc.

### v.

## Debra C. Matthews

Record No. 830526

## Port Packet Corporation

### v.

## E. Grey Lewis, et al.

Record No. 830651

Decided February 1, 1985, at Richmond

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, JJ., and Harrison and Gordon, Retired Justices.

## James N. Fleming

### v.

## W. Bedford Moore, III

Record No. 831446

Decided February 1, 1985, at Richmond

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, JJ., and Harman, Senior Justice, and Gordon, Retired Justice.

4

*Lewis T. Booker (Hunton & Williams,* on briefs), for appellant. (Record No. 830758.)

*S. Keith Barker (Tuck, Freasier & Herbig,* on brief), for appellees. (Record No. 830758.)

*Thomas E. Albro (Barret E. Pope; Smith, Taggart, Gibson & Albro,* on brief), for appellant. (Record No. 830526.)

*Matthew B. Murray* for appellee. (Record No. 830526.)

*Harvey B. Cohen (Joanne F. Alper; William L. Jacobson; Cohen, Gettings, Alper & Dunham,* on briefs), for appellant. (Record No. 830651.)

*William B. Cummings* for appellees. (Record No. 830651.)

*Amicus Curiae: Virginia Press Association, Inc. (Alexander Wellford; David C. Kohler; Christian, Barton, Epps, Brent & Chappell,* on brief), for appellant. (Record No. 830651.)

*D. Alan Rudlin (W. Jeffery Edwards; Gerald G. Poindexter; Hunton & Williams; Poindexter & Poindexter,* on brief), for appellant. (Record No. 831446.)

*Thomas E. Albro (Bradley B. Cavedo; Smith, Taggart, Gibson & Albro,* on brief), for appellee. (Record No. 831446.)

COMPTON, J., delivered the opinion of the Court.

In one opinion, we decide four libel appeals. The plaintiffs are private individuals, not public officials or public figures. Three of the appeals are based on suits against members of the print media. In the fourth appeal, the defendant is a private person. Judgments for compensatory damages have been entered against the defendant in each case. In two cases, the judgments include awards of punitive damages.

The dominant issue to be decided in each case is what standard of liability should govern an award of compensatory damages in a libel action in Virginia, given the developments in federal constitutional law on the subject of libel beginning with *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964). Adjudication of this central question will spawn subsidiary issues common to all the suits. In addition, the awards of punitive damages generate issues common to those two cases. The common questions of law will be analyzed in the first sections of this opinion and, in succeeding sections, the issues peculiar to a specific case will be adjudicated in the section of the opinion devoted to such case.

## I. *The Dominant Issue*

### A. Virginia Background

In Virginia, as in other states, the law of defamation historically has protected a basic interest. The individual's right to personal security includes his uninterrupted entitlement to enjoyment of his reputation. *Fuller* v. *Edwards,* 180 Va. 191, 197, 22 S.E.2d 26, 29 (1942). "Society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt* v. *Baer,* 383 U.S. 75, 86 (1966).

Under the general framework of defamation law in Virginia prior to 1964, the beginning of a period when major aspects of libel law became federalized, the defamed private citizen had to prove only a false publication that included words which were either actionable *per se* according to certain fixed principles, or, if not defamatory *per se,* words which resulted in special damages to the party defamed. *See M. Rosenberg & Sons* v. *Craft,* 182 Va. 512, 518, 29 S.E.2d 375, 378 (1944). Upon such publication,[1] malice was inferred and damage to reputation was presumed. *See* Note, *Defamation in Virginia — A Merger of Libel and Slander,* 47 Va.L.Rev. 1116, 1117 (1961). And, unless the otherwise libelous statement was privileged or the defendant could establish its truth, *Rosenberg* v. *Mason,* 157 Va. 215, 228, 160 S.E. 190, 195 (1931), the publisher was liable for compensatory damages. Upon proof of common-law actual or express malice, the plaintiff was entitled to an award of punitive damages. *James* v. *Haymes,* 160 Va. 253, 263, 168 S.E. 333, 337 (1933).

Commencing in 1964, however, a series of decisions of the United States Supreme Court caused significant changes in the law of libel.

## B. Pertinent Supreme Court Decisions

In *New York Times Co.* v. *Sullivan,* the Supreme Court determined for the first time the extent to which the constitutional protections of speech and press limit a state's power to award damages in a libel action brought by a public official against critics of his official conduct. 376 U.S. at 256. The Court decided that the rules of law applied by the Alabama state courts were constitutionally deficient for failure to provide safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by such a public official. *Id.* at 264. The Court held that "[t]he constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80. In *Garrison* v. *Louisiana,* 379 U.S. 64 (1964), the Court applied

---

[1] No publication is required in an action brought under the Virginia statute of insulting words, Code § 8.01-45. *Davis* v. *Heflin,* 130 Va. 169, 107 S.E. 673 (1921).

the *New York Times* "actual malice" standard to state criminal libel statutes that imposed sanctions for criticism of official conduct of public officials.

■ In *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130 (1966), the Court held "that a 'public figure' who is not a public official may . . . recover [compensatory and punitive] damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id.* at 155. In holding that the standard had been met by the plaintiff in *Butts,* but not in the companion case of *Associated Press* v. *Walker* (decided in the same opinion), the Court rejected the defendant's contention that it could not be subjected to an assessment of punitive damages. Justice Harlan, writing for the majority, stated: "Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse." *Id.* at 161.

■ In *St. Amant* v. *Thompson,* 390 U.S. 727 (1968), the Court identified evidence that may be employed to establish *New York Times* "actual malice." The majority, through Justice White, noted that "evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions." *Id.* at 731. The Court then listed certain acts which show the "recklessness" aspect of "actual malice": intentional fabrication by a defendant of facts or communications; basing an article wholly upon an unverified anonymous telephone call; printing allegations so inherently improbable that only a reckless person would put them in circulation; and publication of an article despite obvious reasons to doubt the truth and veracity of the informant upon whom the article relies for accuracy. *Id.* at 732. The Court said that failure to investigate will not in itself establish bad faith, *id.* at 733, but stated that a "defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *Id.* at 732.

In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29 (1971), a plurality of the Court, through Justice Brennan, extended the *New York Times* "actual malice" standard to publications relating to all matters of public or general concern, irrespective of the public or private nature of the plaintiff. In rejecting the suggested distinction between public officials and public figures on the one hand and private individuals on the other, Justice Brennan focused instead on society's interest in learning about issues of public or general concern. Thus, under *Rosenbloom,* once a trial court determined that the alleged libel involved a matter of public or general concern, the fact finder should then consider whether *New York Times* malice had been proved, paying no heed to the plaintiff's status.

Three years later, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), the Supreme Court expressly repudiated its holding in *Rosenbloom.* One commentator states that the *Gertz* majority sensed "the *Rosenbloom* plurality opinion had nearly destroyed the common law of defamation. . . ." J. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond: An Analytical Primer,* 61 Va.L.Rev. 1349, 1409 (1975).

In *Gertz,* a Chicago policeman had shot and killed a youth. Gertz, a reputable attorney, was employed to represent the youth's family in civil litigation against the officer. The defendant published, in its monthly magazine giving the views of the John Birch Society, false statements about Gertz. The publication implied that Gertz had a criminal record and labeled him a "Leninist" and "Communist-fronter."

Justice Powell, writing for the majority, articulated several important holdings defining "the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." 418 U.S. at 325. First, the Court reaffirmed its rulings in *New York Times* and *Butts* stating that public officials and public figures may recover for defamation only upon clear and convincing proof of *New York Times* malice. Second, the Court made clear that all persons, public or private, may recover presumed or punitive damages only upon clear and convincing proof of *New York Times* malice.

Third, and most important for purposes of the cases at bar, the Court held "that, so long as they do not impose liability without fault, the States may define for themselves the appropriate stan-

dard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347. Justice Powell stated that this approach establishes an equitable boundary between the competing interests involved. "It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation." *Id.* at 348.

The Court, however, expressly limited the applicability of a fault standard. Such limitation has not been sufficiently emphasized in many of the decisions and comments based on *Gertz,* but we think recognition of the limitation is essential to an accurate analysis of the decision. The Court said, quoting from *Butts,* that applicability of a fault standard must be restricted to circumstances where "the substance of the defamatory statement 'makes substantial danger to reputation apparent.' " *Id.* Continuing, the Court stated: "Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." *Id.*; *Time, Inc.* v. *Firestone,* 424 U.S. 448, 464-65 (1976) (Powell, J., concurring).

In addition, the Court said that the State's interest in compensating private individuals for injury to reputation extends no further than compensation for actual injury, which may include impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, as well as out-of-pocket loss. *Gertz,* 418 U.S. at 350. Finally, the Court rejected the *Rosenbloom* plurality's requirement that judges must consider whether publications address issues of "general or public interest," stating that such a test "for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake." *Id.* at 346.

In *Herbert* v. *Lando,* 441 U.S. 153 (1979), the Supreme Court rejected a plea "that the balance struck in *New York Times* should now be modified to provide further protections for the press when sued for circulating erroneous information damaging to individual reputation." *Id.* at 169. The Court, through Justice White, noted that the 1964 *New York Times* decision which "was widely perceived as essentially protective of press freedoms," has been repeatedly affirmed in succeeding cases. *Id.* The Court also pointed

out, however, citing *Firestone* and *Gertz,* that "the Court has reiterated its conviction — reflected in the laws of defamation of all of the States — that the individual's interest in his reputation is also a basic concern." *Id.*

### C. Pertinent Virginia Decisions Since *New York Times*

■ *Sanders* v. *Times-World Corp.,* 213 Va. 369, 192 S.E.2d 754 (1972), was decided after *New York Times* and *Rosenbloom,* but before *Gertz.* There, for the first time, we applied the *New York Times* malice standard to a libel case involving a private person arising from matters of "public or general concern," as required by *Rosenbloom.* "In *Rosenbloom* and *Sanders,* the relevant test was not the status of the plaintiff involved but rather the events which were the subject of the publication." *Newspaper Publishing Corp.* v. *Burke,* 216 Va. 800, 803, 224 S.E.2d 132, 135 (1976). In *Sanders,* we cited three earlier Virginia cases, from 1961, 1967, and 1970 respectively, for the proposition that, where defendants' statements were qualifiedly privileged, the plaintiff bears the burden to establish actual malice. The *Sanders* decision was based, nevertheless, on the federal standards of *New York Times* and *Rosenbloom.*

*Newspaper Publishing Corp.* v. *Burke, supra,* was the first libel case we decided after *Gertz.* Analyzing *Gertz,* we held that the trial court erroneously instructed the jury, in violation of the *Gertz* admonition, that the newspaper defendant could be adjudged liable without fault to the private plaintiffs. Additionally, the Court determined that the trial court incorrectly told the jury that an award of punitive damages could be premised upon a finding of common-law malice rather than *New York Times* "actual malice."[2] Furthermore, while recognizing that we could define our own standard for recovery of actual, compensatory damages as authorized by *Gertz,* we chose not to formulate a Virginia standard in that case. We noted that the jury did not award actual damages, only punitive damages, and termed the task of fixing a *Gertz*-approved standard "unnecessary." 216 Va. at 804, 224 S.E.2d at 136.

---

[2] For a definition of common-law malice, see also *Preston* v. *Land,* 220 Va. 118, 120-21, 255 S.E.2d 509, 511 (1979), a post-*Gertz* case of slander among private individuals in which the federal libel standards were not in issue.

In *Fleming* v. *Moore,* 221 Va. 884, 275 S.E.2d 632 (1981) (hereinafter *Fleming* I), a suit against a non-media defendant and the precursor to the instant case of the same name, we decided that the publication was not defamatory *per se*; that the plaintiff, a private individual, did not forfeit his private status by speaking at public hearings involving land use proposals; that because the plaintiff Moore was not a public figure, he was not required to show *New York Times* malice as a prerequisite to recovery of compensatory damages, *id.* at 892, 275 S.E.2d at 637; that punitive damages may not be awarded without a tandem award of compensatory damages, unless the libel involved was "actionable *per se,*" *id.* at 893-94, 275 S.E.2d at 638; and, that in libel actions not based upon *per se* defamation where *New York Times* malice is not shown, compensatory damages must be limited to actual injuries sustained. We decided, however, that actual injury was not confined to pecuniary loss but included such elements as damage to reputation and standing in the community, embarrassment, humiliation, and mental suffering. We modified language contained in *Shupe* v. *Rose's Stores,* 213 Va. 374, 192 S.E.2d 766 (1972), to the extent that *Shupe* may have indicated that emotional upset and embarrassment cannot constitute "special damages." 221 Va. at 894, 275 S.E.2d at 639.

In *Fleming* I, we further decided that *Gertz* did not control because the *Gertz* rule was not explicitly extended to non-media defendants. We stated, nevertheless, that we share the *Gertz* concern with the assessment by juries of punitive damages " 'in wholly unpredictable amounts bearing no necessary relation to the actual harm caused.' " *Id.* at 893, 275 S.E.2d at 638, *quoting Gertz,* 418 U.S. at 350. Thus, we held in *Fleming* I, a suit by a private individual against a non-media defendant, that a recovery of punitive damages must be based upon the *New York Times* actual malice standard that is applicable to media defendants, that is, clear and convincing proof of knowledge of falsity or reckless disregard for the truth.

### D. The Virginia Standard of Fault for Compensatory Damages

The parameters within which we must fix the Virginia standard as a matter of state law have been set forth in our prior discussion of *Gertz*. The plaintiffs in the present appeals argue for a negligence standard. Generally, the defendants assert that a defamed

private individual should be required to establish *New York Times* malice to recover actual, compensatory damages in this State. In a brief *amicus curiae* filed in one of the media appeals, the Virginia Press Association, Inc., argues that "a negligence standard is no standard at all" and that such a requirement "simply does not provide the protection needed to ensure a free and open press." Asserting that the matters involved in these four appeals involve issues of public concern, the defendants contend that our pre-*Gertz Sanders* decision is controlling and that liability for the alleged defamations requires proof of *New York Times* "actual malice." We do not agree.

The Supreme Court in *Gertz* left little doubt that it expected many of the states to adopt a negligence standard. Justice Powell, while noting that allowance of presumed damages would unnecessarily exacerbate the danger of media self-censorship, stated that the policy considerations concerning punitive-damage awards are "wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions." 418 U.S. at 350. Justice Blackmun, concurring, flatly said "that the Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard. . . ." *Id.* at 353. Chief Justice Burger, dissenting, said that the majority "introduces the concept that the media will be liable for negligence in publishing defamatory statements with respect to [ordinary private citizens]." *Id.* at 355. Justice Brennan, dissenting, forecast adoption of "a reasonable-care standard" by many states as the "probable result of today's decision." *Id.* at 366. Justice White, dissenting and deploring the "additional burden on the plaintiff of proving negligence or other fault," stated that "[u]nder the new rule the plaintiff can lose, not because the statement is true, but because it was not negligently made." *Id.* at 376.

Certainly, despite the Supreme Court's forecasts, we properly may choose to adopt as a matter of state law a stricter standard than ordinary negligence. We will not do so. Indeed, while we did not explicitly fix the standard in *Fleming* I, we implicitly indicated that a level of liability less than *New York Times* malice was all that was required. We said: "Therefore, [the plaintiff] was not required to show, as a prerequisite to recovery of compensatory damages, that Fleming acted with malice that met the *New York Times* standard." 221 Va. at 892, 275 S.E.2d at 638.

We hold, therefore, that in an action brought by a private individual to recover actual, compensatory damages for a defamatory publication, the plaintiff may recover upon proof by a preponderance of the evidence that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based. Under this standard, truth no longer is an affirmative defense to be established by the defendant. Instead, the plaintiff must prove falsity, because he is required to establish negligence with respect to such falsity. In addition, we hold that such liability may be based upon negligence, whether or not the publication in question relates to a matter of public or general concern.

The application of this negligence standard is expressly limited, however, to circumstances where the defamatory statement makes substantial danger to reputation apparent. The trial judge shall make such determination as a matter of law. If, on the other hand, no substantial danger to reputation is apparent from the statement in issue, *New York Times* malice must be established to recover compensatory damages.

Nothing in the public policy of the Commonwealth or in our prior decisions requires adoption of a standard higher than one of ordinary negligence. The Constitution of Virginia does not mandate embracement of a more stringent standard. Article I, § 12 provides, in part, "that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. . . ." That provision recognizes the balance to be struck between the right of free expression enjoyed by the individual and the press on the one hand and the right of defamed individuals to hold the speakers "responsible" for damage to reputation on the other. *See* I A. Howard, *Commentaries on the Constitution of Virginia,* at 249-59 (1974). And, as we already have said, our *Sanders* decision is not controlling, because it was decided before *Gertz* and was based on *Rosenbloom,* nor are any of our other cases.

Moreover, we think that a negligence test strikes a proper balance between the rights of the news media and the rights of private individuals. As noted in *Gertz,* the private individual is more vulnerable to injury to reputation inflicted by defamatory falsehood than are public officials and public figures who ordinarily "enjoy significantly greater access to channels of effective commu-

nication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz,* 418 U.S. at 344. Even though "the truth rarely catches up with the lie," *id.* n.9, the opportunity for rebuttal is more readily available to the public person. Consequently, the state interest in protecting the private individual is greater than in the case of a nonprivate person.

In addition, we believe that the negligence standard will not result in self-censorship, as the media defendants argue, and that the duty of reasonable care is an acceptable burden for the press to bear. After all, the concept of negligence is fundamental to the imposition of tort liability in Virginia in the great majority of legal relationships that are created daily, and we have not been convinced that the publisher of the defamatory falsehood should be elevated to a preferred status for the assessment of liability for the harm caused by such a tort. Neither the intentional lie nor the negligent error substantially advances society's interest in uninhibited and robust debate. *See id.* at 340.

Also, the limitations we have placed on the rule will serve to insulate the publisher from liability based on a publication the content of which does not warn a reasonably prudent editor or broadcaster of its defamatory potential. In such a case, *New York Times* malice must be established in order to recover compensatory damages. The mere negligent error or the careless misstatement of fact which, on its face, does not appear to be defamatory will not result in liability for compensatory damages being imposed on the publisher.

Finally, the standard we adopt today is in accord with the rule embraced by a substantial number of the states that have decided the issue since *Gertz. See* E. Collins and J. Drushal, *The Reaction of the State Courts to Gertz v. Robert Welch, Inc.,* 28 Case W.Res.L.Rev. 306 (1978). To date, at least 30 states and the District of Columbia have adopted a negligence standard in media cases involving private persons, either after discussing the issue or without discussing the question.[3] Also, two federal courts inter-

---

[3] The cases that discuss the issue are: *Peagler* v. *Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216 (1977); *Dodrill* v. *Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied,* 444 U.S. 1076 (1980); *Phillips* v. *Evening Star Newspaper Co.,* 424 A.2d 78 (D.C. 1980), *cert. denied,* 451 U.S. 989 (1981); *Miami Herald Publishing Co.* v. *Ane,* 423 So.2d 376 (Fla. App. 1982); *Cahill* v. *Hawaiian Paradise Park Corp.,* 56 Hawaii 522, 543 P.2d 1356 (1975); *Troman* v. *Wood,* 62 Ill.2d 184, 340 N.E.2d 292

preting Virginia law after *Gertz* anticipated that we would adopt a negligence standard. *See General Products Co. v. Meredith Corp.,* 526 F. Supp. 546 (E.D. Va. 1981); *Mills v. Kingsport Times-News,* 475 F. Supp. 1005 (W.D. Va. 1979). And the drafters of the Restatement responded to *Gertz* by adopting a negligence standard for the media defendant who defames a private person or a public person in a matter unrelated to his public capacity. Restatement (Second) of Torts § 580B (c) (1977). *See generally* R. Smolla, *Let the Author Beware: The Rejuvenation of the American Law of Libel,* 132 U.Pa.L.Rev. 1 (1983).

## II. *Subsidiary Issues*

██ Because one of the present appeals involves a non-media defendant, the question arises whether the negligence standard is limited to media defendants, in which case the non-media defendant would remain subject to the rule of strict liability. *Gertz* involved a media defendant and the Court's opinion did not address the instant issue. We hold, however, as a matter of state law that the negligence standard should be applicable to media and non-media defendants alike.

(1975); *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975); *McCall v. Courier-Journal & Louisville Publishing Co.,* 623 S.W.2d 882 (Ky. 1981), *cert. denied,* 456 U.S. 975 (1982); *Wilson v. Capital City Press,* 315 So.2d 393 (La. Ct. App. 1975); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975); *Madison v. Yunker,* 180 Mont. 54, 589 P.2d 126 (1978); *McCusker v. Valley News,* 121 N.H. 258, 428 A.2d 493, *cert. denied,* 454 U.S. 1017 (1981); *Marchiondo v. Brown,* 98 N.M. 394, 649 P.2d 462 (1982); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied,* 423 U.S. 883 (1975); *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okla. 1976); *Jones v. Sun Publishing Co.,* 278 S.C. 12, 292 S.E.2d 23, *cert. denied,* 459 U.S. 944 (1982); *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn. 1978); *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex. 1976), *cert. denied,* 429 U.S. 1123 (1977); *Seegmiller v. KSL, Inc.,* 626 P.2d 968 (Utah 1981); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976); *Havalunch, Inc. v. Mazza,* 294 S.E.2d 70 (W. Va. 1982); *Denny v. Mertz,* 106 Wis.2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883 (1982).

The cases that do not discuss the issue are: *Browning v. Birmingham News,* 348 So.2d 455 (Ala. 1977); *Corbett v. Register Publishing Co.,* 33 Conn. Supp. 4, 356 A.2d 472 (1975); *Savannah News-Press Div. v. Whetsell,* 149 Ga. App. 233, 254 S.E.2d 151 (1979); *Bandelin v. Pietsch,* 98 Idaho 337, 563 P.2d 395, *cert. denied,* 434 U.S. 891 (1977); *Wheeler v. Green,* 286 Or. 99, 593 P.2d 777 (1979); *DeCarvalho v. DaSilva,* 414 A.2d 806 (R.I. 1980); *Colombo v. Times-Argus Ass'n, Inc.,* 135 Vt. 454, 380 A.2d 80 (1977); *Adams v. Frontier Broadcasting Co.,* 555 P.2d 556 (Wyo. 1976).

The logic of such a conclusion is compelling. It would indeed be bizarre to hold as a matter of tort law that individuals are liable without fault while the media is liable only upon a showing of negligence. *See Jacron Sales Co.* v. *Sindorf,* 276 Md. 580, 350 A.2d 688, 695 (1976). The media, being composed of professionals and capable of causing much greater damage because of wider distribution of the communication, are more cognizant of the risk of liability and more likely to take appropriate precautions. The private-individual defamer, however, whose utterance is likely to cause less harm, ordinarily will not realize the potential liability resulting from his communication and will fail to take similar precautions. *See* Restatement (Second) of Torts § 580B, comment e (1977). *Contra Denny* v. *Mertz,* 106 Wis. 2d 636, 659-61, 318 N.W.2d 141, 152-53 (1982). Neither policy nor reason supports different treatment of the respective types of defendants. *See Jacron Sales Co.,* 276 Md. at 593-94, 350 A.2d at 696.

Furthermore, in *Fleming* I, we applied the constitutional privilege of *New York Times, Butts,* and *Gertz* to a non-media defendant where recovery of punitive damages was sought. We now take the next logical, consistent step and apply the *Gertz*-authorized negligence standard to non-media defendants where recovery of compensatory damages is sought.

██ Another subsidiary issue that arises from establishment of a negligence standard for compensatory damages is the current status of the common-law qualified privileges in Virginia. Unlike some jurisdictions, Virginia does not permit a qualified privilege to be defeated upon a showing of mere negligence. We require proof of common-law malice, that is, behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made. *Story* v. *Newspapers, Inc.,* 202 Va. 588, 590, 118 S.E.2d 668, 670 (1961). This being a more stringent standard than negligence, the qualified privileges survive in Virginia. This means, of course, that the defendant may still avoid liability based on qualified privilege even though the negligence standard is met by the plaintiff. When a qualified privilege is established and not defeated by a plaintiff's evidence of common-law malice, the negligence standard is subsumed in the higher standard and it is of no consequence that the plaintiff might have met the lower standard of negligence. *Jacron Sales Co.,* 276 Md. at 600, 350 A.2d at 699-700.

■■ The other subsidiary issue involves the scope of appellate review in these cases. Relying on *Bose Corp.* v. *Consumers Union of the United States, Inc.,* 104 S.Ct. 1949 (1984), the media defendants assert that, in a case raising First Amendment issues, an appellate court has an obligation to make an independent examination of the entire record in order to insure that the judgment of the trial court does not constitute a forbidden intrusion on the exercise of free expression. We agree that an appellate court in Virginia must conduct such independent examination of the whole record on the issue of punitive damages or where *New York Times* malice must be established, but not on the question of compensatory damages when *New York Times* malice need not be proven.

*Bose* primarily is concerned with the application of Rule 52(a), Federal Rules of Civil Procedure, which fixes a "clearly erroneous" standard for federal appellate review of findings of fact. Nevertheless, the Supreme Court in First Amendment cases arising in state courts repeatedly has held that the independent examination contended for is required on review. *See, e.g., New York Times,* 376 U.S. at 284-86; *St. Amant,* 390 U.S. at 732-33. In *Bose,* the Court held: "The requirement of independent appellate review reiterated in *New York Times* v. *Sullivan* is a rule of federal constitutional law." 104 S.Ct. at 1965. Consequently, because we apply the federal constitutional rule of *New York Times* to the punitive-damage issue in a State defamation suit, we likewise apply the federal constitutional rule of independent appellate examination to such an issue.

Thus, we hold that an appellate court in Virginia, on the issue of punitive damages or where *New York Times* malice must be proven, must independently decide whether the evidence in the record on appeal is sufficient to support a finding of *New York Times* "actual malice" by clear and convincing proof. 104 S.Ct. at 1965. This does not mean that the reviewing court may disregard the determinations made on credibility of witnesses by the trier of fact or that the presumption of correctness that attaches to factual findings is to be discounted. *Id.* at 1959. The rule simply means that appellate judges in such a case must examine the facts pertinent to the punitive-damage award and exercise independent judgment to "determine whether the record establishes actual malice with convincing clarity." *Id.* at 1967.

■ In contrast, however, on the issue of compensatory damages in libel cases when *New York Times* malice need not be proven, we will continue to follow the established standard of review mandated by Code § 8.01-680, that is, "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." The reason we do not embrace *Bose* on this issue is that the *Bose* mandate of independent examination is bottomed on the obligation of reviewing judges to assure that governing federal constitutional law has been applied properly. The negligence standard for compensatory damages that we have adopted is not a matter of governing federal constitutional law; rather, within the parameters authorized by *Gertz,* we have fixed the standard as a matter of state law. Accordingly *Bose,* as well as the federal decisions on which it is based, is not controlling on this issue.

### III. *The Gazette, Inc. v. Harris, et al.*

In November of 1981, appellees James William Harris, Virginia Mae Harris, his wife, and Barbara H. Sweeney filed separate motions for judgment against appellant The Gazette, Inc., seeking compensatory and punitive damages caused by an allegedly libelous statement published in the July 30, 1981 editions of the newspaper. *The Gazette* is published weekly and circulated in the counties of Goochland and Powhatan.

The plaintiffs, private citizens of Powhatan County, claimed that readers of the news item in question would understand they had been charged with aggravated sexual battery. In fact, a child of the Harrises and a child of Mrs. Sweeney had been molested by one Harold F. Payne.

The article read as follows:

"CRIMINAL CASES

"The following criminal cases were among those heard last week in District Court:

Goochland

Danny Johnson, bad check, $80.
Leigh W. Hague, reckelss [sic] driving in boat, $63.
Alvin Fleming, malicious wounding, $130, 90 days suspended.

Harold F. Payne, aggravated sexual battery, Barbara H. Sweeny [sic], property bond; aggravated sexual battery, James and Virginia Harris, property bond charges certified to circuit court (charges filed in the adult division of juvenile court)."

Following a consolidated trial of the three cases, the jury found in favor of James and Virginia Harris, and Barbara Sweeney, fixing compensatory damages in the amounts of $30,000, $10,000, and $10,000, respectively. The jury did not award punitive damages. The trial court entered judgments on the verdicts, and we granted *The Gazette* an appeal from the February 1983 final orders.

The assignments of error present issues pertaining to the standard of fault to be applied, sufficiency of the evidence, misdirection of the jury, and excessiveness of the verdicts.

The evidence may be summarized briefly. In July of 1981, Payne was arrested and charged in Goochland County with aggravated sexual battery of the Harris child and the Sweeney child. The three parents were the complaining witnesses against Payne. A reporter for *The Gazette* prepared a narrative story about the incidents and submitted it to the paper's editor. After reviewing the draft, the editor directed the reporter to verify the charges from court records.

The reporter examined the pertinent docket page of the Juvenile and Domestic Relations District Court of Goochland County. The information on the docket sheet was contained in pre-printed columns, the head of each column containing pre-printed or typed words and abbreviations. Symbols for respective columns, reading from left to right, were as follows: "COUNSEL CA P W"; "OFFICER/CMPLNT BSE"; and "CCRE DATE APPEAL DATE." The reporter did not understand the meaning of the abbreviations except he knew "CMPLNT" designated "complainant."

The reporter copied that portion of the docket page pertaining to Payne's charges. He made a verbatim abstract except he did not include the column designations, the dates of the offenses, or the amounts of the property bonds. The copy became the draft of an article to be included in "The Public Record" section of the July 30th issue. "The Public Record" was a regular feature of the paper and routinely included information from the local public

records about real estate transfers recorded, building permits issued, criminal cases heard, and marriage licenses issued.

The reporter submitted his second draft to the editor, who approved it because he considered it to be accurate and concise. The editor testified, dissecting the article, that the item intended to convey to the reader that Payne was the defendant charged with aggravated sexual battery, that Mrs. Sweeney was the "person placing the charge," and that Payne was "out" on a property bond. The editor continued: "Semicolon, we start back with the antecedent, which is Mr. Payne, aggravated sexual battery again, James and Virginia Harris placing the charges." He further testified: "Again, a property bond has been posted and the charges are certified to the Circuit Court." The evidence showed that only the defendant's name was inserted in the majority of listings in "The Public Record" and that, prior to the date in question, the names of complaining witnesses and crime victims were never listed.

The plaintiffs showed that they had enjoyed good reputations prior to the publication and that they did not wish the vulgar incidents involving their children to become matters of public knowledge. They also proved that persons in the community interpreted the news item to mean they had been accused of immoral conduct. In addition, the plaintiffs established they were embarrassed, upset, hysterical, and emotionally damaged as the result of the publication.

Over the newspaper's objection, the trial court applied a negligence standard. No additional discussion is necessary to explain our rejection of the newspaper's argument that *New York Times* malice should have been adopted by the trial court as the proper standard of liability.

Application of the express limitation, which was articulated in *Gertz* and which now has been incorporated in the Virginia rule, was not an issue below. Nonetheless, we are of opinion that the content of the statement in question makes substantial danger to reputation apparent. In other words, the news item, under the circumstances, should warn a reasonably prudent editor of its defamatory potential.

The threshold determination to be made by a trial judge on the question whether there is substantial danger to reputation apparent from the content of a publication resembles the determination traditionally made by the court on the question whether a statement is libelous *per se*. A trial judge must decide,

viewing the circumstances objectively, whether a reasonable and prudent editor should have anticipated that the words used contained an imputation necessarily harmful to reputation. We hold that the harmful potential of the words used here, *i.e.,* that plaintiffs were accused of crimes, should have been apparent to the paper's editor, if he had exercised ordinary care.

Viewed objectively, the publication may be interpreted to report that Mrs. Sweeney and the Harrises had been charged with aggravated sexual assault. The evidence showed that prior to the date of the publication in question, no edition of *The Gazette* had published in "The Public Record" portion of the paper the name of any person except that of a defendant. Indeed, the three cases reported immediately above the Payne charges apparently recited the names of the defendants only. Also, the article contained no information which explained the significance of the names appearing in the segment referring to the plaintiffs. A reader, perusing the words in sequence, would probably conclude from the arrangement of the language that the plaintiffs were charged with crimes and that they had been required to post property bonds in order to remain at large and free of custody pending trial of the charges. Such a conclusion would be justified because the information follows the same pattern—charge, name of person or persons charged, and requirement of bond. The listing of Payne's name at the beginning of the item is a confusing factor but does not detract from the defamatory potential of the remaining language.

Under these circumstances, a reasonable and prudent editor should have been alerted to the likelihood of damage to reputation. The publication was not merely confusing, unclear, and garbled (conditions which ordinarily would not create defamatory potential); it also used language containing imputations necessarily harmful to reputation. Consequently, the express limitation was not applicable and the trial court correctly adopted the negligence standard.

*The Gazette* contends that even if the trial court was correct in applying a negligence standard of liability, the court erred in submitting the case to the jury on that issue. The newspaper argues there was insufficient evidence on which a rational juror could conclude that the paper was negligent. We disagree.

The pertinent instruction informed the jury, in part, that "in order to establish that Gazette was at fault, plaintiffs must prove by a preponderance of the evidence that Gazette acted with negli-

gence in preparing and publishing the article." This instruction comports with the essential elements of the standard we have articulated today. The evidence showed that the editor believed the report to be true although, reasonably interpreted, the article was false. The editor testified that he thought the item was accurate and concise because it was an apparent verbatim copy of a court record. But it was for the jury to determine whether the principals of *The Gazette,* the reporter and editor in this case, lacked reasonable grounds for their belief in the accuracy of the article or, alternatively, negligently failed to ascertain the facts, especially because the publication did not identify the roles the plaintiffs played in the criminal proceedings reported. This failure to describe the significance of the names appearing in the item resulted from carelessness "in preparing and publishing the article," in the language of the instruction.

On the question of negligent preparation, we already have discussed the reporter's admitted inability to interpret the symbols, except for "CMPLNT," on the docket page. No verification of the information finally gathered was sought by the reporter or suggested by the editor. Consequently, a complete understanding of the only source of information, the court record, was essential to the accuracy and clarity of the report. The jury was entitled to conclude that the reporter was negligent because of his ignorance. The jury also was entitled to find that the negligence should not have been excused merely because the court record was copied almost verbatim and because the format of the publication did not deviate substantially from the form of the docket page. Finally, the article did not even include the information conveyed by the symbol "CMPLNT," the only abbreviation understood by the reporter. This was an act of omission that the jury also could determine constituted negligence.

There were substantial additional facts presented on the question of negligent publication. For example, the reporter who wrote the article testified the item "looked like an error," thereby admitting that the article conveyed an inaccurate representation of the plaintiffs' involvement in sensitive crimes. The editor indicated the item was "not unclear," but *The Gazette's* publisher, when asked if he understood what the article said, replied, "I think I do." The publisher, who did not review the article before printing, conceded he previously had stated that he understood the article to mean the plaintiffs had posted property bonds "because *they* charged

somebody with aggravated sexual assault." (emphasis added). In addition, the jury was entitled to determine whether, in reporting crimes of this magnitude, the long-standing custom of *The Gazette* should have been violated, by publication of the complaining witnesses' names, without greater care being exercised to assure that the item's format accurately conveyed the information reported.

Next, the newspaper contends the trial court erroneously instructed the jury that it could award damages for injury to reputation. While conceding that the plaintiffs established they enjoyed good reputations in Powhatan County prior to the publication, the paper asserts that, with one exception, "there was not a shred of evidence of what the plaintiffs' respective reputations were after the alleged libel." The defendant contends that Mrs. Sweeney's employer testified that Mrs. Sweeney's reputation did not suffer "in the least" as a result of the publication. The newspaper asserts that other witnesses opined that the Harrises' reputation had not changed "an iota" as the result of the libel.

Viewing the evidence in the light most favorable to the plaintiffs, who are before us armed with jury verdicts approved by the trial court, we find there was sufficient circumstantial evidence of damage to plaintiffs' reputation caused by the libel. For example, Mr. Harris testified that following publication of the article, which essentially charged the plaintiffs with being sexual perverts in a rural county, neighborhood children "stopped coming to the house." Harris also testified that he had observed differences in the way neighbors treated him before and after the incident. A friend of the plaintiffs testified that his prior good opinion of the Harrises and Mrs. Sweeney was renewed after the incident only upon a full explanation of the meaning of the news report.

Next, defendant claims the trial court misdirected the jury by refusing two instructions on the issue of damages. We find no error in this regard. An instruction tendered by defendant on the question of proximate cause was an incorrect statement of the law. A nominal damage instruction proffered by the paper had two vices. First, if given, it improperly would have suggested to the jury the amount of a nominal award — "you may return a verdict for the plaintiff in some nominal amount such as one dollar." Second, it was unnecessary, for the reasons we shall elaborate upon in the next section of this opinion. In that section, we discuss the refusal of a nominal damage instruction offered by a

media defendant which made a contention in support of the instruction similar to that made by *The Gazette* and which relied on the same case authority cited by *The Gazette*.

Finally, the newspaper argues the verdicts of $30,000, $10,000, and $10,000, respectively, are excessive in amount, relying on general statements from our cases which set forth criteria for determining excessiveness. In the main damage instruction, Instruction 11, the trial court permitted the jury to consider, in determining the amount of the awards, the circumstances surrounding the statement, the occasion on which it was made and the extent of the publication, the nature and character of the insult, the probable effect on those who "heard" the statement, and its probable effect upon the respective plaintiffs' "personal feelings and upon [their] standing in the community and in business." The instruction authorized the jury to compensate the plaintiffs for insult, including pain, embarrassment, humiliation, and mental suffering; injury to reputation; and, in the case of Mr. Harris, any monetary loss, including medical expenses, caused by the publication.

The focus of the defendant's excessiveness argument is upon the alleged failure of proof to support, in defendant's words, "injury to business." The newspaper asserts that Mr. Harris was not employed and was not seeking employment, that the record does not reflect whether Mrs. Harris was employed, and that Mrs. Sweeney had merely failed to receive a pay raise following the incident. This is actually an insufficiency-of-the-evidence argument.

We will take no further notice of this contention dealing with injury to plaintiffs' "business" because defendant failed to object to that portion of Instruction 11 which permitted the jury to assess an amount on account of such a loss. The sole objection by defendant to Instruction 11 was that "there is no evidence of any' damage to the reputation of any plaintiff." Because defendant did not object below to the "business" loss reference in the instruction, on the ground of insufficiency of the evidence to support such an item, the defendant will not be permitted to rely on such ground on appeal. *See* Rule 5:21. The basis for such a ruling is obvious. If the argument made on appeal had been made to the trial judge, the court would have had the opportunity to consider the question and the instruction could have been amended by deleting the reference to business loss, assuming the defendant's contention is correct.

The balance of defendant's excessiveness argument suffers from the same deficiency. The newspaper now contends there was no competent evidence to support the plaintiffs' alleged emotional injuries, asserting the plaintiffs "offered only vague generalizations and conclusory, self-serving opinions. . . ." Continuing, the defendant argues: "These statements of opinion or conclusion — utterly lacking a factual basis — cannot meet the standards . . . of competent evidence of actual injury." This, too, is an argument that the evidence was insufficient to support a finding that the plaintiffs suffered mental distress; it is not a true excessiveness argument. This contention should have been made to the trial court in opposition to the pertinent elements of Instruction 11. It was not. Consequently, for the reasons already assigned, such contention will not be noticed for the first time on appeal under the guise of an argument that the verdicts are excessive.

The judgments in favor of the plaintiffs will, therefore, be affirmed.

### IV. *Charlottesville Newspapers, Inc. v. Matthews*

In March of 1982, appellee Debra C. Matthews sued appellant Charlottesville Newspapers, Inc., for compensatory and punitive damages resulting from an allegedly libelous publication appearing in the February 4, 1982 edition of *The Daily Progress,* a newspaper of general circulation in the City of Charlottesville. The plaintiff alleged that a news article published by defendant about the outcome of a rape trial libeled her in that the item identified her by name, referred to her on seven occasions as "Miss Matthews" when in fact she was lawfully married, and stated that she was pregnant at the time she allegedly was raped by one Jeffrey Williams.

The headline and first four paragraphs of the ten-paragraph article stated:

#### "MAN FOUND GUILTY OF FORNICATION

. . . .

"An Albemarle County Circuit Court jury found Jeffery [sic] Williams of 2221 Jefferson Towne apartments guilty of fornication Wednesday and fined him $100.

"Williams, 31, had been charged with the rape on May 8 of Debra C. Matthews, 23, of Whitewood Villiage [sic] Apartments.

"Fornication, a misdemeanor, is the crime of voluntary sexual intercourse by an unmarried person.

"According to Miss Matthews' testimony at the preliminary hearing, the incident occurred at the apartment of Williams' sister, Rosyln Wood. Miss Matthews, who was pregnant at the time, had gone there to dress because the electricity was out at her apartment."

The remainder of the article, continuing to refer to the plaintiff as "Miss Matthews," related the facts of the alleged rape and summarized statements of Williams' attorney made after the criminal trial.

The case was tried to a jury and, at the conclusion of the plaintiff's evidence, the claim of punitive damages was abandoned. The jury found in favor of the plaintiff and fixed her compensatory damages at $25,000. The trial court confirmed the verdict, and we awarded the newspaper an appeal from the January 1983 judgment order.

The defendant contends that the article was not actionable as a matter of law, that compensatory damages are recoverable against a media defendant in a libel suit only upon proof of *New York Times* malice and not mere negligence, that the evidence was insufficient as a matter of law to establish negligence, and that the trial court erred in refusing to instruct on qualified privilege and nominal damages.

The trial court applied a negligence standard. No further discussion is necessary to explain our disagreement with the newspaper's contention that the *New York Times* malice standard should be adopted for proof of compensatory damages.

The question whether the content of the article makes substantial danger to reputation apparent was not an issue below. Nevertheless, we are of opinion that the limitation on application of the negligence standard should not operate in this case.

As we have said, the threshold determination to be made, under the limitation and before applying the negligence principle, is whether as a matter of law, when viewing the circumstances objectively, a reasonable and prudent editor should have anticipated that the words used contained an imputation necessarily harmful to reputation. Manifestly, the content of a news item which states that an unmarried woman is pregnant creates a substantial danger to reputation and should warn a reasonably prudent editor of the

item's defamatory potential. One reasonable construction from such a reference is that the female committed the crime of fornication and became pregnant from the act. Therefore, the trial court's adoption of the negligence rule was proper.

In a sense, the foregoing discussion on defamatory potential forecasts our decision on the newspaper's claim that the trial court should have decided, as a matter of law, that the article was not in fact defamatory instead of permitting the jury to pass on the question.

> "Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used. In order to render words defamatory and actionable it is not necessary that the defamatory charge be in direct terms but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory. Accordingly, a defamatory charge may be made by inference, implication or insinuation." *Carwile* v. *Richmond Newspapers,* 196 Va. 1, 7, 82 S.E.2d 588, 591-92 (1954).

Not only should a reasonably prudent editor have appreciated the defamatory *potential* of the item in question, the publication was sufficiently defamatory on its face, under *Carwile,* to permit a jury to decide whether *in fact* the statement actually was defamatory. Thus, the trial court did not err in failing to decide the question as a matter of law.

The defendant attacks on appeal the sufficiency of the evidence to prove negligence. That issue was not raised in the trial court. During argument of its motion to strike the evidence, made at the conclusion of the plaintiff's case and renewed at the end of the evidence, the defendant argued against adoption of the negligence standard. It never contended that the evidence was insufficient to raise a jury issue as to defendant's negligence. After the trial judge announced that he would apply the negligence standard, the defendant argued only two issues. First, it asserted that the publication was not actionable. Second, it argued that the pa-

per should be exonerated on the basis of qualified privilege. Moreover, in stating its objections to the instructions, the defendant did not argue insufficiency of the evidence, only that the standard should be *New York Times* malice and not negligence. Accordingly, we will not notice on appeal an issue that was not raised in the trial court. Rule 5:21. Parenthetically, it is quite understandable why sufficiency of the evidence was not raised below because, as will be apparent from the discussion that follows, evidence of the newspaper's negligence was abundant.

Discussion of defendant's contention that it was protected from the accidental mistake by qualified privilege requires a brief recitation of the facts. The author of the article had been hired as a part-time reporter and photographer by the newspaper about a month before the item was published. The young reporter had received no training, guidance, or instruction in covering the "courthouse beat." His only prior experience consisted of: work on his high school yearbook; participation in two college journalism courses; and compilation of information for one magazine article.

The reporter did not attend the rape trial in the circuit court or the preliminary hearing on the charge in the general district court. Instead, he based his article on a review of the transcript of testimony given at the preliminary hearing, without knowing whether that same testimony was presented in the circuit court trial. The plaintiff was identified throughout the preliminary hearing transcript as "Mrs. Matthews." The reporter claimed to have obtained some of the facts from an interview with a circuit court deputy clerk, but the clerk testified that she only handed the reporter the court file and did not talk to him. The defense attorney in the criminal trial testified that the reporter merely asked him by telephone for a comment on the outcome of the trial. During examination by the plaintiff as an adverse witness, the reporter admitted that he did not talk to the criminal defendant, the Commonwealth's Attorney or any of his assistants, the court reporter who was present at trial, the bailiff on duty in the courtroom, the investigating police officer, anyone in the sheriff's office, anyone at the hospital where the plaintiff was taken after the alleged rape, the judge, or any jurors. The reporter testified that his use of "Miss" was "just a slip of my memory."

The defendant's city editor, supervisor of the reporter who wrote the article, testified that although *The Daily Progress* had a policy of not printing names of alleged rape victims, the paper

printed the plaintiff's name in this instance because the jury had determined she was not a victim of rape. He also testified that he "had no idea" that the reference to the plaintiff was false, and that nothing about the article put him on notice of a factual mistake. He stated that it "never occurred" to him that calling a person "Miss" and saying she was pregnant might be offensive.

As we have said, the common-law qualified privileges survive establishment of the negligence standard for compensatory damage recovery in Virginia. Nevertheless, we reject the newspaper's contention that it was entitled to an instruction on the defense of privilege in this case. The defendant argues that its account of the court proceedings was a fair, impartial, and substantially accurate report, and that the trial court erred in failing to permit the jury to determine whether the privilege applied and, if so, whether the paper abused the privilege.

We hold that the defamatory words, as a matter of law, were not substantially accurate. Manifestly, the only factual errors in the article related to the paper's description of Mrs. Matthews' marital status. Nonetheless, the defamatory content of the article is not cured by the newspaper's otherwise "substantially accurate" account of the criminal trial. The designation of Mrs. Matthews as "Miss" was wholly inaccurate. That act was at the root of the wrong that defamed her. The clear error in describing the plaintiff's marital status, coupled with the gratuitous mention in the article of her pregnancy, resulted in damage to her reputation. Hence, the inaccurate publication deprives the newspaper of the benefit of the privilege that arises from reporting court proceedings. *See Times-Dispatch* v. *Zoll,* 148 Va. 850, 857-58, 139 S.E. 505, 507 (1927).

Finally, the defendant contends the trial court erred in refusing to instruct the jury on nominal damages as follows:

"Nominal damages are those recoverable where a legal right is to be vindicated against an invasion that has produced no actual present loss of any kind or where, from the nature of the case, some injury has been done the amount of which the proof fails to show. The law infers some damage from the invasion of a right.

"In this connection the court instructs you that, if you believe from the evidence that there is no proof of actual dam-

age to the plaintiff resulting proximately from the defendant's acts, you may award her nominal damages only."

Relying on *News Leader Co.* v. *Kocen,* 173 Va. 95, 3 S.E.2d 385 (1939), the defendant argues that giving a compensatory damage instruction without a corresponding instruction on nominal damages creates an "imbalance" that is "objectionable" and consequently constitutes reversible error. We do not agree.

In *Kocen,* the trial court used the word "substantial" twice in a damage instruction to modify the word "compensatory." Overturning a judgment for the plaintiff, the Court said: "The reversible error lies in the fact that the instructions emphasized the right of the plaintiff to recover substantial damages without any instruction laying equal emphasis on the fact that the jury might return a verdict for nominal damages." 173 Va. at 110, 3 S.E.2d at 392. In the present case, unlike *Kocen,* there was no instruction inviting the jury to award "substantial" damages. Hence, there being no need to counterbalance, an instruction on nominal damages was unnecessary, and the trial court correctly refused to so instruct.

For these reasons, the judgment below in favor of the plaintiff will be affirmed.

### V. *Port Packet Corporation v. Lewis, et al.*

In July of 1980, two articles and an editorial on the subject of child abuse were published in *The Alexandria Port Packet,* a weekly newspaper circulated in the Alexandria area. In April of 1981, appellees E. Grey Lewis and Carolyn G. Lewis, his wife, sued appellant Port Packet Corporation, publisher of the paper, for compensatory and punitive damages. In an amended motion for judgment, the plaintiffs alleged that defendant published untrue and defamatory statements concerning the plaintiffs, causing them to be exposed to public contempt and ridicule. The plaintiffs alleged they were embarrassed and humiliated, and that their reputations for honesty and integrity had been impaired.

Following a four-day trial, a jury found in favor of the plaintiffs, fixing compensatory damages at $50,000 and punitive damages at $100,000. The trial court overruled defendant's motion to set aside the verdict and entered judgment in favor of the plaintiffs, jointly, in the amounts fixed by the jury. We awarded defendant an appeal from the January 1983 final order.

On June 10, 1980, about 8:00 a.m., Edward Grey Lewis, Jr., the nine-month-old son of the plaintiffs, was being fed by his mother from a bottle in a bedroom adjacent to the kitchen of the plaintiffs' home in Alexandria. Mrs. Lewis left the child momentarily against pillows on a bed while she stepped to the kitchen to assist Mr. Lewis, who was preparing a strawberry shortcake. Several minutes later, the plaintiffs heard a "loud crash" in the bedroom and discovered the child had fallen from the bed. The child appeared to be seriously injured. The Lewises rushed the baby to Alexandria Hospital where he died two days later from head injuries sustained in the fall. Subsequently, the Alexandria Child Protective Services Unit and the Alexandria Police Department investigated the child's death, which was ruled accidental. The police officially closed their investigation on July 28, 1980.

In the meantime, the defendant published in its July 16 edition of *The Packet* the first of a series of two articles, as well as an editorial, on the subject of child abuse in Alexandria. The article, which is the main subject of this dispute, appeared under the by-line of reporter Adrian Higgins. The headline read: "2 TOTS DIE AS CHILD ABUSE CLIMBS." The first several paragraphs of the ten-column article stated:

"Early in June, nine-month-old Mark fought for his short life after receiving head injuries in what police believe was a vicious attack on the infant. Mark lost his fight.

"The same week two-year-old Robert also suffered a skull fracture in another suspected attack. Robert clung to life for two weeks.

"On April 28, a Monday, five year-old Asia Marie returned to a city day care center after a weekend spent with her teacher's aide displaying signs of a severe beating. Asia's two-year-old sister came back with lesser injuries.

"What all these frail victims are believed to have in common is exposure to one of Alexandria's fastest growing social problems: child beating."

The next several paragraphs cited statistics on the incidence of child abuse in the City, commenting that many assaults on children go undetected in a "society that has traditionally regarded the family home a shelter and sanctuary for young human beings. . . ." The article then summarized an interview with a su-

pervisor of the local social services department who indicated that a "greater portion of maltreated children" are of "parents who have more money, but feel the economic pinch hard enough to become stressful and violent."

The article then listed incidents of child abuse, without giving names of the individuals involved in the alleged offenses. That information preceded the following:

> "Denied even the pains of childhood, nine-month-old Mark (not his real name) received a fractured skull during the first week of June and was taken to Alexandria Hospital where he died two days later. Detectives are treating his death as a homicide.
>
> "The same week two-year-old Robert (not his real name) suffered similar injuries. At a time when other kids his age are curiously exploring life's trinkets, Robert was taken to Alexandria Hospital and then transferred to D. C. Children's Hospital to receive more specialized care. Hooked up to life support systems in a futile attempt to revive him, Robert was declared medically dead two weeks later. Based on autopsy reports, Alexandria police investigators are also treating Robert's death as a murder."

The remainder of the article discussed the abuse of Asia Marie, referred to earlier, and her sister. The article concluded with statements made by Sergeant Ronald Uhrig of the Alexandria Police Department. Uhrig was quoted as pointing out the difficulties in obtaining convictions in child abuse cases, noting: " 'The biggest problem is you have two parents (of an abused child) and one won't testify against the other, and doesn't have to.' "

The editorial in the same edition was captioned "CHILD ABUSE." The writer discussed the "painful" subject, pointed out difficulties of proving the charges of abuse, mentioned that it was necessary to learn of child abuse before it could be stopped, and stated that notoriety of such cases might be a "solution" to the "problem." The editorial concluded:

> "It may be that publicity is the main weapon against the child abuser. It is a shameful thing to be known as a child abuser. It might influence the abuser if he or she knew that the glare of news coverage and the probability of the neighbors knowing all about [sic] was part of the act.

"Could it work?"

The issues on appeal involve whether there was sufficient identification of the plaintiffs in the publication to form a basis for an action of libel; whether a negligence standard should be adopted for an award of compensatory damages; whether the evidence was sufficient to sustain the damage awards; and whether the awards were excessive.

Discussion of the identification question requires a summary of the evidence. James W. Coldsmith, publisher and editor of *The Packet,* and Adrian Higgins, one of the paper's two full-time reporters, became interested in the problem of child abuse in Alexandria. They decided to proceed with an article on the general subject and this effort eventually became the two-part series published in July of 1980.

Police Sergeant Uhrig was among the individuals interviewed by Higgins in preparing the series. During the course of the mid-July interview, Uhrig told Higgins about several instances of suspected child abuse, including the death of a nine-month-old child. Without identifying the victim by name, Uhrig told the reporter that the child was a male who died from head injuries, including a skull fracture, which were not consistent with a normal fall. Actually, Uhrig was relating the bare facts of the death of the plaintiffs' child. He told Higgins that the child died in early June at Alexandria Hospital. He also told Higgins that the case was classified as a suspicious death and that it was being investigated procedurally as a homicide. Uhrig testified that he explained to Higgins that the final results of a police investigation determine the ultimate classification of a death, whether it be accidental, natural, or a homicide. Initially, he explained, a death that is not natural is classified by the police as a homicide.

Uhrig testified that he did not tell Higgins that the police believed there had been "a vicious attack" on the infant, that the child was a victim of "child beating," or that the police were treating the child's death as a "murder." Uhrig further testified that, after publication of the article, he told Higgins that he objected to use of words in the article that were not Uhrig's words, especially the use of "vicious attack." According to Uhrig, the reporter replied that he used the words "to be very graphic."

Higgins testified that because Uhrig did not identify the nine-month-old child, as well as the two-year-old which was discussed

in the interview, he decided to give the children the fictitious names of "Mark" and "Robert." The reporter stated this was a "writing tool" that provided a convenient way to refer to the children in the article. One expert witness testified that the journalistic term for such a device is "anecdotal lead."

In preparing the article, the reporter intended to inform the paper's readers, in general terms, of what he believed was a growing social problem in the Alexandria area. There was no intention to deal specifically with any of the cases mentioned in the publication, only to discuss the incidents as illustrative of the "problem." Higgins did not seek further verification of the information he received about "Mark" because he assumed, mistakenly, that Uhrig was in charge of the investigation into the cause of the child's death. The reporter also decided that an attempt for additional verification, from anyone who was in a position to know the facts, would be futile because of the confidential nature of such information. At the time the article was published, neither Higgins nor Coldsmith, the publisher and editor, knew the identity of "Mark" or his parents.

Coldsmith reviewed and edited the article prior to publication. He had confidence in Higgins, who was a British-trained, award-winning reporter with considerable experience. Coldsmith knew that Higgins had interviewed Uhrig, an "official source," and perceived no need for additional investigation about the facts of "Mark's" death. Coldsmith, who wrote the editorial, believed the article met the standard of a reasonably prudent journalist.

The plaintiffs presented extensive evidence that members of the community who knew the Lewises, or knew of them, identified the plaintiffs as parents of the child named "Mark" in the article. This evidence came not only from the plaintiffs themselves but also from a relative, friends, officials involved in the investigation, and virtual strangers.

Initially, the defendant argues on appeal the identification question. This was first raised in the trial court by demurrer. Emphasizing that the fictitious name "Mark" was used and that the article nowhere refers to the plaintiffs, the newspaper contends that the publication is not actionable because it contained no defamatory imputation against any particular individual who is reasonably identifiable by the words of the article. In addition, the defendant urges that the evidence failed to show, under the pertinent

instruction in the case, that the article was intended to refer to the plaintiffs. We disagree with both contentions.

In Virginia, a libel plaintiff must show that the alleged libel was published "of or concerning" him. *Cave* v. *Shelor,* 16 Va. (2 Munf.) 193 (1811). He need not show that he was mentioned by name in the publication. Instead, the plaintiff satisfies the "of or concerning" test if he shows that the publication was intended to refer to him and would be so understood by persons reading it who knew him. *Powell* v. *Young,* 151 Va. 985, 997-98, 144 S.E. 624, 627, *rev'd on other grounds,* 151 Va. 1002, 145 S.E. 731 (1928). In other words, the test is met if the plaintiff shows that the publication was "in its description or identification such as to lead those who knew or knew of the plaintiff to believe that the article was intended to refer to [him]." *Butler* v. *News-Leader Co.,* 104 Va. 1, 7, 51 S.E. 213, 215 (1905). But if the publication on its face does not show that it applies to the plaintiff, the publication is not actionable, unless the allegations and supporting contemporaneous facts connect the libelous words to the plaintiff. If the rule were otherwise, any plaintiff could adopt and apply to himself any libelous matter and obtain a recovery. *Ewell* v. *Boutwell,* 138 Va. 402, 413, 121 S.E. 912, 915 (1924).

The Restatement comment is consistent with the rule in Virginia.

"It is not necessary that the plaintiff be designated by name; it is enough that there is such a description or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody." Restatement (Second) of Torts § 564 comment b (1977).

In the present case, even though the publication on its face did not refer to the Lewises by name, the contemporaneous facts sufficiently connected the publication to the plaintiffs to establish an issue for the jury. These facts included the extensive testimonial evidence that, immediately upon publication of the article, many individuals who knew the plaintiffs, or knew of them, identified the Lewises as the parents of "Mark." The conclusions of those witnesses are amply supported by underlying facts which es-

tablish an interconnection from "Mark" to the Lewis child to the Lewises.

The article recited specific details about the child's sex and age, the nature of his injuries, when he died, how he died, the hospital where he died, and how long he lived after sustaining the injuries. This was not simply a report stating that an infant recently died in a local hospital of head injuries in a case of suspected child abuse. Instead, the publication was explicit in detailing "Mark's" tragedy using the exact facts surrounding the death of the Lewis child. One of the plaintiffs' expert witnesses stated the obvious when he testified: "The more identifying detail that is made available to you, the more you might tend to know who this person is, even though you never knew the person by name as such."

The evidence supporting the connection to the plaintiffs, parents of "Mark," is just as strong. The article and editorial pointedly focused on parents of abused children and tied those references to the cases documented. The editorial made specific reference to the article and suggested that "publicity is the main weapon against the child abuser." Noting that being known as a child abuser is "shameful," the writer opines that "the glare of news coverage" will alert "the neighbors" to the abuser's conduct, a reference that obviously includes parents as those to be in the "glare" of publicity. Moreover, there were repeated references in the article to the parents' role in the child abuse problem. For example, the "family home" which was formerly a "shelter" for children has been converted to "a battlefield," according to the article. A cause of the increasing number of attacks on children is "parental stress" erupting in the homes "of parents who have more money" than "poor families," the publication reported. Mr. Lewis is an attorney practicing in the District of Columbia. In addition, the article and editorial pointed out the difficulty in prosecuting cases of child abuse because often a mere infant is involved and neither of the parents will testify against the other. *But see* Code § 19.2-271.2.

Consequently, we hold the trial court did not err in ruling that the question of identification was an issue of fact to be decided by the jury.

The foregoing comments dispose of the defendant's contention that the evidence was insufficient to refer to the plaintiffs "as required by the law of the case. . . ." The following instruction was given without objection as to form:

"The newspaper article in issue does not name the plaintiffs. In order to recover, therefore, the plaintiffs must show by a preponderance of evidence that the article was published of and concerning them.

"In order so to find, you must determine that the article was intended to refer to the plaintiffs, directly or indirectly, and that it is reasonably probable that members of the public who read the article would understand it as referring to them."

Defendant argues there was no evidentiary basis for the jury to have found that the article was intended to refer to the plaintiffs, either directly or indirectly. We do not agree.

True, neither the reporter nor the editor knew the identity of the child named "Mark," or that the plaintiffs were the parents of the child. Nevertheless, this does not mean that the defendant did not intend the article to refer to the Lewises *indirectly*. *The Packet* had embarked on a crusade against child abusers. This is clear from the editorial. As a part of this campaign, the newspaper intended that parents abusing children be identified. As the plaintiffs argue, the jury could reasonably conclude that the newspaper intended to refer directly to "Mark's" abusers, his parent or parents, and therefore, indirectly to the Lewises. Accordingly, the jury's finding is supported by sufficient evidence and is consistent with the pertinent instruction.

Next, the defendant contends that a showing of more than simple negligence is necessary for an award of compensatory damages. This argument already has been considered and rejected. The trial court properly applied a negligence standard. The threshold question of facial defamatory potential was not an issue below. We conclude, nevertheless, that the content of the article should have warned a reasonably prudent editor of its defamatory potential.

The publication categorically stated that the Alexandria Police were treating the death of "Mark" as a murder. In a paragraph devoted to "Robert," the article noted that police "are also treating Robert's death as a murder." The use of "also" clearly refers to the preceding paragraph about "Mark's" death. Furthermore, the clear implication from the headline and the content was that the murder occurred during an act of child abuse as the result of a "vicious attack on the infant." These circumstances, viewed objec-

tively, should have alerted an editor, who was exercising reasonable care, to the harmful potential of the words used, *i.e.,* that the parents of the child dubbed "Mark" were charged with murder, a fact that was utterly false. The evidence showed that the reporter and the editor were not operating under the constraints of a deadline. Indeed, Coldsmith testified he realized that, with the use of the "vicious attack" line, "very serious things" and "very serious events" were being described. A command by the editor for simple verification with, for example, the police officer actually conducting the investigation of the death would have revealed the inaccuracy of the potentially defamatory language.

Next, the defendant contends the trial court erred when it permitted the jury to award compensatory damages for injury to reputation when there was no evidence of such injury. The specific contention is that the trial court improperly included, as an item in the damage instruction, a direction for the jury to consider the effect of the defamation upon the plaintiffs' "standing in the community" in order to determine injury to reputation. The defendant says there was no evidence the article had any effect on the plaintiffs' standing in the community. We disagree.

The plaintiffs, residents of the "Old Towne" section of Alexandria, presented evidence they feared that some of their neighbors, knowing they were accused of child abuse, would "be on the lookout for further child abuse" because the Lewises had other children living with them who survived their son. In addition, Mrs. Lewis related an incident in a local grocery store when, after the publication, a casual acquaintance, who had been cordial in the past, "made a complete turn-about and walked the other direction." Also, a local realtor stated he had read the article, had discussed it with friends approximately six times, and, at a political meeting, had admonished Coldsmith regarding the publication. The realtor told the editor that he objected to the article and that he thought the paper "had gone too far" and "was doing bad things to people that already suffered enough." This and other evidence was sufficient to permit the jury to consider whether the publication diminished the plaintiffs' standing in the community.

We likewise reject defendant's argument that the compensatory-damage award of $50,000 was excessive. The newspaper contends the jury was influenced by passion and was misled. The defendant suggests there was an emotionally charged atmosphere during the trial generated by evidence surrounding the tragic

death of the plaintiffs' son. It points out that the plaintiffs did not prove any monetary damage as the result of the publication and that the plaintiffs' mental suffering required no medical treatment. We conclude that this joint award to two plaintiffs was not excessive.

Consistent with our decision in *Fleming* I, the trial court permitted the jury to assess compensatory damages for plaintiffs' "pain, embarrassment, humiliation and mental suffering, and any injury to their reputation," according to the pertinent instruction. In addition, the jury was admonished to award damages that resulted only from the defendant's wrong, and not from other causes. The verdict was approved by the trial judge.

■ There is no fixed standard for measuring compensatory damages, and the amount of the award is largely a matter of discretion with the jury to be based on the facts and circumstances of each particular case. Unless the amount of the award is so excessive as to shock the conscience of the court, or to create the impression that the jury was influenced by passion or prejudice, a verdict approved by the trial court will not be disturbed on appeal. *Hughes* v. *Moore,* 214 Va. 27, 36, 197 S.E. 2d 214, 220 (1973).

A study of this record convinces us that the compensatory-damage verdict is not excessive. For example, Mrs. Lewis was "horrified," "mortified," and "humiliated" by the article because, in part, she believed the police felt she and her husband had attacked their child. The publication, of course, appeared in the midst of the police investigation. She was "scared to death" and feared she "was going to be put in prison the next day." She was "so sensitive" to the article that she believed individuals would think she had abused her child and "gotten away with it and that they shouldn't associate with [her]." For about six months after the article was published, the plaintiffs isolated themselves from friends. In addition, Mrs. Lewis lost sleep and experienced stomach pains because she was "just aware of public humiliation."

Mr. Lewis was "overwhelmed" when he read the article. He expected to be "indicted at any moment." He testified that he was not prepared "to deal with the situation," in which the police may have believed "I had viciously attacked and killed my little boy, Grey." He testified that his emotions upon reading the article the day after its publication were different from the emotions that he had been experiencing over the loss of his son. He felt "tremendous humiliation," withdrew from his friends and associates in the

community, and feared the information he was a child abuser "would spread throughout the community and into Washington." A former public servant, Mr. Lewis had hoped to return to government service, but was concerned by the competition for posts to which he aspired due to his newly acquired "baggage." Also, the Lewises became afraid to discipline their five-year-old daughter by spanking her. They feared "somebody will hear about it, then will say, 'Oh, God, there are the Lewises again.' "

Next, the defendant contends that the evidence failed to establish a basis for an award of punitive damages. The trial court submitted the punitive-damage issue to the jury with a requirement that *New York Times* malice must be established by the plaintiffs. This action would have been correct if there had been sufficient evidence to clearly and convincingly prove that the defendant made the statements knowing they were false or made them so recklessly as to amount to a willful disregard for the truth. But we have conducted an independent examination of the entire record, according to *Bose Corp.* v. *Consumers Union of the United States, Inc.,* and have determined that the evidence is not sufficient to support a finding of New York Times "actual malice" by clear and convincing proof.

The conduct of the defendant was negligent, but not malicious in the *New York Times* sense. The record is devoid of evidence to show that the reporter or editor knew the defamatory statements were false. Therefore, the plaintiffs must recover punitive damages, if at all, upon evidence of reckless disregard of whether the words were false or not. The articles were researched in depth. In addition to Uhrig, Higgins talked with the supervisor of the Child Protective Services Unit of the Alexandria Department of Social Services, two assistant city prosecutors, the director of a local program dealing with abused children, and a social worker. The articles were edited in a deliberate fashion with consideration given to accuracy. Because the editor was aware that the reporter had used an "official source" for the "serious" portions of the article, no further verification was suggested. The editor approved the article for publication believing it complied with standards of proper journalism.

In making an independent examination of the record on this issue, we must be certain that the judgment for punitive damages "does not constitute a forbidden intrusion on the field of free expression." *New York Times,* 376 U.S. at 285. With this mandate

in mind, we cannot say that the record in this case establishes the required actual malice with convincing clarity. The defamatory statements were not made, under the evidence, with a high degree of awareness that they were probably false. Consequently, the judgment for punitive damages is erroneous and will be annulled.

Accordingly, the judgment below will be affirmed as to the compensatory-damage award, reversed as to the punitive-damage award, and final judgment will be entered for the plaintiffs on the former award.

## VI. *Fleming v. Moore*

In January of 1977, appellee W. Bedford Moore, III, sued appellant James N. Fleming for libel arising from an advertisement published a year earlier in *The Cavalier Daily,* a student newspaper circulated on the campus of the University of Virginia and in the Albemarle County area. Fleming was a black real estate developer and Moore was a white University professor. The dispute, and resulting publication entitled "Racism," arose from efforts by Fleming, and others, to develop land in the vicinity of Moore's home situated in the County.

Following a 1977 trial, the court below entered judgment on a jury verdict awarding Moore $10,000 compensatory damages and $100,000 punitive damages. On appeal, we reversed the judgment and remanded the case for a new trial on all issues. The 1981 *Fleming* I decision has been summarized in section I(C) of this opinion.

The new trial was held in October of 1982 and resulted in a jury verdict in favor of the plaintiff for $100,000 compensatory damages and $250,000 punitive damages plus 12 per cent interest on $250,000 from January 16, 1976, upon which the trial court entered judgment in June of 1983. We awarded the defendant another appeal, limited to questions concerning the standard of fault to be applied for recovery of compensatory damages, sufficiency of the evidence to support the punitive award, excessiveness of both awards, and the correctness of prejudgment interest on the punitive award. The evidence presented during the retrial differs to some degree from that produced at the first trial.

In the mid-1970s, Fleming, a County native and a successful realtor-appraiser, joined three white business associates in an effort to develop approximately 127 acres of land in the County for residential purposes. The site was within the immediate watershed

of the Rivanna Reservoir, a source of drinking water. The planned unit development, called "Evergreen," was to house lower and middle-income families of both races. Moore, a resident of the Charlottesville area since 1947, was an assistant professor in the Humanities Division of the University's School of Engineering and Applied Science. Moore lived near the development site. His residence was named "Shack Mountain" and was described as a Twentieth Century reproduction of an Eighteenth Century Jeffersonian pavilion; it was a "small version" of Monticello, not a "replica."

During a period of several years, defendant Fleming sought unsuccessfully to obtain a special permit from county authorities for use of the agriculturally zoned land. Plaintiff Moore and others opposed the development because of concern over the proposed high density (initially, 804 dwelling units were planned) and because of fear that the reservoir would be polluted.

A series of public hearings was held before the Planning Commission and the Board of Supervisors. The plaintiff and others spoke in opposition to the several plans that were submitted by the defendant. The Planning Commission staff recommended that the first Evergreen proposal be rejected mainly because the planned density was too great. At the time, pollution of the reservoir was also of considerable concern to the planners. The Planning Commission and the Board of Supervisors rejected defendant's first proposal, mainly because of the high density projection. The second plan for Evergreen, with a lower proposed density, was likewise turned down by the County because of conservation and environmental factors relating to the reservoir. Eventually, the Board of Supervisors in early 1976 imposed a moratorium on construction within the reservoir watershed until a study in progress dealing with pollution of the reservoir could be completed. The jury has found on disputed facts that race was not a factor in any decisions made by County officials relating to Evergreen and that the plaintiff was not motivated by racial considerations in his opposition to defendant's development.

Nevertheless, as the land-use controversy developed, defendant thought that his plans were being frustrated solely on racial grounds. He noticed that white developers were obtaining approval of their plans while his were being denied. Also, he assumed that citizen groups opposing the development were conspiring against him because he was black. In addition, the planning

staff had recommended a 100-foot tree buffer to separate the developed area from the Shack Mountain property. The defendant believed that the plaintiff was a leading opponent of Evergreen and that Moore was responsible for imposition of the condition requiring the buffer. Fleming thought Moore was attempting to have the buffer placed on Fleming's property and that Moore somehow would take advantage of a racially restrictive covenant in prior deeds to the property.

Consequently, defendant drafted the publication in question. He arranged for it to appear as a paid advertisement in two January 1976 issues of *The Cavalier Daily,* a campus newspaper read by approximately 15,000 persons. The advertisement is copied verbatim in *Fleming* I, 221 Va. at 887-88 n.3, 275 S.E.2d at 634-35 n.3. It was headlined "RACISM" and "Signed: James N. Fleming."

After stating that the author had endeavored to provide pleasant housing for "working people," the item said:

"I do not expect any Farmington members to buy my houses. The tenured position-holders who live off the public dole at the expense of the working people are already well-housed, and could not be expected to live in a racially-integrated neighborhood, anyhow.

"There is a great deal of irony in the fact that here in Mr. Jefferson's country 200 years after his vision of situating his beloved Monticello upon the hilltop overlooking the developing community we have a replica of Monticello upon the hill overlooking my property which is occupied by a man who wants to deprive working people of the same opportunities that Mr. Jefferson sought for them. Mr. Jefferson even located his slaves' quarters down the hill from his house, but Bedford Moore, the occupant of little Monticello does not want any black people within his sight."

The advertisement then referred to a "great conflict" between the "haves and the have-nots" and stated that "we have created too much financial security for the tenured segment of the economic community whose greed is repeatedly shown by their expression of 'I've got mine — too bad about you'."

Continuing, the author wrote that he was a "lover of liberty" and could not stand by to "see the have-nots oppressed by the no-growth people who are living off of our work." He next stated:

"I know that this Country did not achieve the highest living standard in the world by no-growth or by oppression of the working man, and yet today the opportunity to improve one's living standard is being violently opposed by the same people who oppose my proposed neighborhood.

"Pollution of the reservoir is being used as the current excuse to foster no-growth. The solution, of course, is to remove the guaranteed incomes of these greedy people and put them in the position of seeing the world through the eyes of one seeking the opportunity to improve his or her living standard. Only then would they admit that the pollution excuse is a sham."

The advertisement concluded: "I will develop Evergreen, and a lot of people will benefit from it."

Relying on *Bose Corp.* v. *Consumers Union of the United States, Inc.,* the defendant contends we should make an independent examination of all issues in this case to insure that the judgment below does not constitute a forbidden intrusion on the exercise of free expression. In addition, Fleming argues that the advertisement related to a matter of vital public concern, a land-use controversy, and that *New York Times* "actual malice" is the proper standard of liability for compensatory damages. We have addressed these issues already and no further discussion is necessary to explain our rejection of the contentions. The trial court was correct in applying a negligence standard in this case, and in using the principle in a suit against a non-media defendant.

We will consider next the question whether the award of compensatory damages is excessive. The defendant argues that the award shocks the conscience in that it bears no relationship to the loss actually sustained by Moore.

Moore read the advertisement on both days it was published. In describing the effect of the publication, Moore testified that race had no bearing on his opposition to Evergreen. Rather, he was concerned about pollution of the reservoir, preserving his privacy, and protecting the historic character of his home, which had been placed on the national and state registers of historic places. Con-

sequently, he testified, he was "very keenly" embarrassed and humiliated by the racial attack because he had been "brought up with sort of innocence on the whole subject." He stated that the publication made him conscious of race in a way he deplored because he had been taught to be "color blind" and "considerate" in his dealings with all other persons.

Moore testified: "I was seriously upset to have a man that I disagreed with in public meetings go around behind me and put into the University student newspaper such a malicious attack on me, my character. This was done in front of my colleagues at the University, students, black and white." Describing his concern that the item had been placed in the student newspaper as opposed to some other publication, Moore said: "It was very near home and concerned me very much indeed. I felt that he had put a gap in my honor that could only be restored by vindication of my fellow citizens on this jury."

The evidence showed that during 1975 and 1976, a number of racial concerns confronted the University. The school was trying to attract minority students and faculty. Tension had developed on campus because of the University President's membership in an exclusive private club, Farmington, and there were demands that he resign his office. The plaintiff proved that publication of the advertisement in the midst of this turmoil adversely affected his teaching and his relationship with his students of both races. Dr. Edgar F. Shannon, Jr., President of the University from 1959 to 1974, testified that the perceived racial attitudes of a professor are important to his relations with his students and materially affect the atmosphere in the classroom. Shannon indicated that he had never known Moore to do or say anything degrading to black persons or the black race.

Testimony showed that Moore was "very upset" by the publication and felt he had experienced "a terrible wrong." The evidence showed that other faculty members at the University as well as students made repeated inquiries about Moore and whether the statements in the item were true.

Summarizing the damage he suffered, Moore testified, "It's not an experience I would visit on most people. It's very unhappy." Moore said the humiliation had not lessened with the passage of time: "It still stings. I still feel my honor has been questioned, that's not something you shrug off easily."

Ordinarily, damage awards fixed by a jury following a properly conducted trial and approved by the trial judge are "held to be inviolate against disturbance by the courts." *Smithey* v. *Refining Company,* 203 Va. 142, 145, 122 S.E.2d 872, 875 (1961). But, "[a] healthy administration of justice requires that, in a proper case, the courts must take action to correct what plainly appears to be an unfair verdict. This authority is an ancient and accepted part of the common law." *Id.* at 146, 122 S.E.2d at 875. When there is a claim that the verdict is excessive and it appears that the award is so out of proportion to the damages sustained to suggest that it is not the product of a fair and impartial decision, it becomes the duty of the court to correct the injustice. *Id.,* 122 S.E.2d at 875-76. This is such a case.

We agree with the defendant that the amount of the award bears no relationship to the loss actually sustained by the plaintiff. Clearly, Moore suffered damage to his reputation, embarrassment, humiliation, and mental suffering from this defamatory publication made negligently. Nevertheless, the verdict of $100,000 is so out of proportion to the damage sustained as to be excessive as a matter of law. As the defendant points out, Moore experienced no physical manifestation of any emotional distress. Moreover, he sought no medical attention for any condition resulting from the publication. In addition, there was no evidence that Moore's standing with his peers was diminished as the result of the libel. Indeed, the evidence shows that Moore's acquaintances supported him; one indicated that: "As far as I personally am concerned, . . . he lost nothing." Actually, the evidence showed that Moore continues to be held in high esteem among his community of friends and colleagues. Thus, we find that the amount of the verdict bears no reasonable relation to the damages sustained and, therefore, is not supported by the evidence. Hence, the trial court erred in refusing the post-trial motion to set aside the compensatory award as excessive. The court should have granted the motion and then considered requiring the plaintiff to remit a portion of the award or submit to a new trial under the provisions of Code § 8.01-383.1.

Section 6 of Article VI of the Virginia Constitution, dealing with the power of this Court upon reversal, modification, or affirmance of a judgment below, provides, in part: "In any civil case, [the Supreme Court] may enter final judgment, except that the award in a suit or action for unliquidated damages shall not

be increased or diminished." We have interpreted this section: "The plain purpose of the provision is to leave to the factfinding tribunal—the jury or the trial court sitting as a jury—the function of fixing the amount of unliquidated damages. It does not deprive this court of the authority to remand the case to the lower court with direction that the plaintiff be put upon terms to remit a portion of an award for unliquidated damages or else submit to a new trial." *United Construction Workers* v. *Laburnum,* 194 Va. 872, 900, 75 S.E.2d 694, 712 (1953), *aff'd,* 347 U.S. 656 (1954). Upon rehearing of *Bishop* v. *Webster,* 154 Va. 771, 153 S.E. 832 (1930), the Court said that "the power long exercised by this and all other courts to put the plaintiff upon terms, and to allow him the option of waiving a portion of his damages or have a new trial," is not affected or diminished "in the slightest degree" by the foregoing constitutional section. 154 Va. at 787, 155 S.E. at 828. For a case in which this Court diminished a damage award, see *Lorillard* v. *Clay,* 127 Va. 734, 760, 104 S.E. 384, 392-93 (1920), decided before the 1928 enactment of the forerunner to the present constitutional provision. Acts 1928, ch. 205, p. 660.

Accordingly, we will reverse the compensatory award and remand the case with direction to the trial court to require the plaintiff to remit a substantial part of his recovery or else submit to a new trial upon the issue of damages only.

██ Next, the defendant contends there was insufficient evidence of actual malice to support the punitive award. We do not agree.

We have made an independent examination of the record on this issue to be certain that the judgment for punitive damages does not constitute a forbidden intrusion on the field of free expression. The trial court properly instructed the jury that the plaintiff was required to establish *New York Times* malice, that is, that Moore, by clear and convincing evidence, had to prove that Fleming knew the statements were false or that he made them, according to the instruction, "so recklessly as to amount to a willful disregard for the truth. . . ."

We will assume without deciding that Fleming is correct in his position that Moore failed to prove that Fleming knew the defamatory statements were false. Nonetheless, there was substantial, credible evidence to support the jury's finding that Fleming acted with recklessness that was tantamount to a willful disregard for the truth.

On this point, Fleming argues that looking through his eyes "at his world as it existed in January 1976 . . . the only possible conclusion is that [he] was not motivated by actual malice but by genuine frustration." But evaluation of this element of proof must be from an objective standpoint, not merely from a subjective perspective.

Fleming abandoned all judgment and reason in composing and publishing the advertisement. For example, he accused Moore of racial prejudice without possessing any objective basis for the charge. Naming Moore in the publication, Fleming demeaned him as being a tenured position-holder living off the "public dole" at the expense of working people. There was no evidence that Moore, or any other person in a similar occupation, was being supported to the prejudice of other groups of citizens. There was no proof that Fleming had any legitimate reason to believe Moore wished to deprive "working people" of any opportunity. Fleming had no proper grounds to suppose that Moore, as one of the so-called "no-growth people" was oppressing other individuals. Fleming recklessly stated that Moore's opposition to the development on pollution grounds was a "sham" to conceal his supposed real purpose, *i.e.,* oppression of black citizens and others who would live in the planned community. Finally, Fleming's act of publishing the advertisement in the student newspaper on the campus where Moore taught supports the conclusion that defendant's motive was to intimidate Moore in order to eliminate the voice of a leading opponent to Fleming's development.

Next, defendant contends the amount of the punitive award shocks the conscience in that it bears no relationship to the intended purpose of punitive damages, which is to punish the defendant for his conduct and to serve as a warning to others not to engage in similar activity. Defendant says the award of $250,000, plus interest on that amount from January 16, 1976, is unjust and establishes that the jury misconceived the law or the facts or was actuated by passion and prejudice.

The independent examination we make on the punitive-damage issue is not limited to proof of punitive liability. The First Amendment implications flowing from the amount of such an award require the reviewing court to consider the effect of approval of such an award on self-censorship in derogation of the right of free speech. Moreover, a jury verdict for punitive damages cannot be allowed to work an injustice and result in oppres-

sion. *Stubbs* v. *Cowden,* 179 Va. 190, 199, 18 S.E.2d 275, 280 (1942). Where a punitive award is substantially in excess of what ordinarily might be expected as punishment for the particular conduct, the reviewing court has a duty to anull the award unless the circumstances are so egregious as to constitute a sufficient punishment for the wrongful activity. *See id.* at 200, 18 S.E.2d at 280. We hold that the amount of this award, including the interest factor, constitutes a forbidden intrusion on the exercise of free expression and that it is substantially in excess of adequate punishment for defendant's conduct.

Without question, as we have said, Fleming acted with actual malice. Nevertheless, the punishment for this excessive harangue is not merely punitive, it is destructive, even though Fleming estimated his assets at close to one million dollars. While the elements of compensatory damages differ from the requirements to establish punitive damages, many factors apply to both on appeal. For example, the absence of physical manifestation of Moore's emotional distress must be considered. The fact of no substantial reduction in Moore's standing with his associates must not be overlooked. Indeed, Moore was not charged with commission of a crime. The amount of punitive damages awarded should bear some reasonable relationship to the actual damages sustained and to the measure of punishment required; otherwise, the award on its face indicates prejudice or partiality. *Id.* at 201, 18 S.E.2d at 280. This is such an award and it cannot stand.

Consistent with our disposition of the compensatory award, and on the same authority, we will reverse the punitive award, with direction to the trial court to require the plaintiff to remit a substantial part of his punitive recovery or else submit to a new trial upon the issue of damages only.

Because the main question regarding interest was not preserved properly in the trial court and because the interest issue may not arise upon remand, we do not address that question. In addition, we deny the plaintiff's motion to dismiss.

For these reasons, the judgment below will be affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.

Record No. 830758—*Affirmed.*

Record No. 830526—*Affirmed.*

Record No. 830651—*Affirmed, in part,
reversed, in part,
and final judgment.*

Record No. 831446—*Affirmed, in part,
reversed, in part,
and remanded.*

POFF, J., concurring in part and dissenting in part.

I do not approve the compensatory-damage standard of liability the majority imposes upon the media defendants.

The free press clause of the First Amendment was designed, not so much as a license for publishers, but as an engine of the people's right to know what the press is uniquely equipped to discover and report. The goal of the majority, which I applaud, is to strike a public-policy balance between the interest a private person has in his good name and the interest the public has in the media's freedom to publish. When a defamatory publication causes these competing interests to collide, courts must weigh constitutional values and resolve the conflict by defining the standard of liability. Except for cases involving qualified privilege (a concept left undefined), the majority has adopted a simple-negligence standard. I fear that standard creates an impolitic imbalance between the competing interests.

The actual-malice standard weighs heavily in favor of the media defendant at the expense of the injured private plaintiff; on the other hand, the simple-negligence standard tends to chill both reportorial free press and editorial free speech, and self-censorship by a timorous media disserves the people's right to know. I would reject both standards and strike a balance midway between the two extremes.

For compensatory-damage claims, I favor a gross-negligence standard. Specifically, I would hold that, when the content of a false publication makes substantial danger to the reputation of a private person apparent, that person may recover compensatory damages against a media defendant if he proves by a preponderance of the evidence that the defendant's negligence in the investigation and verification of the content of the publication was so gross as to shock the conscience of fair-minded men and so heedless of the truth as to evince a flagrant indifference to his rights.

*See Chapadeau* v. *Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975).

I recognize that the courts of most states, exercising the discretion granted in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974), have adopted the simple-negligence standard. We ought not fear to join the minority. This Commonwealth first proclaimed the free-press principle in 1776 in Article XII of the Virginia Declaration of Rights, and James Madison was largely responsible for inclusion of the First Amendment in the Constitution of the United States. In my view, a rule which makes publishers and broadcasters liable for simple negligence weakens Virginia's historical commitment to freedom of the press and encumbers the right of the people to learn what they need to know to govern themselves wisely.

In keeping with the standard I have defined, I will concur in part and dissent in part. In the *Gazette* case and in the *Charlottesville Newspapers* case, I must dissent from the decision to affirm the several verdicts because each was based upon an instruction defining the simple-negligence standard. For the same reason, I dissent from the decision to affirm the compensatory-damage award in the *Port Packet* case; however, I concur in the decision to reverse the punitive-damage award in that case because I agree that the evidence fails to show actual malice. In the *Fleming* case, I concur in full.

HARRISON, Retired Justice, concurring in part and dissenting in part.

The opinion of the majority finds precedential support in cases decided by this and several other state courts. I agree that in each of the cases under review the defendant failed to exercise ordinary care and therefore acted negligently. This dissent stems from my disagreement with the Court's refusal to adopt in defamation cases as a matter of state law a stricter standard than that of ordinary negligence. Ordinary care is that care which is commensurate with the occasion. It is not absolute or intrinsic. It is always relative to some circumstances of time, place, manner, or person and becomes a question of fact to be decided by a jury.

Juries are randomly selected, and the principal criteria for service thereon is not to be a felon, not under age eighteen, and not unable to communicate in the English language. Present-day ju-

ries often return verdicts that are completely out of proportion to the harm done. The verdicts under review are no exception. Trial judges are reluctant to disturb the verdict of a jury. Appellate courts are equally as reluctant to sustain a trial court when it does take such action.

I do not concur in the suggestion that a gross negligence standard be adopted. The distinction between gross and ordinary negligence is too vague and shadowy to be of any practical importance. The difficulty that courts and juries had in making this distinction in motor vehicle accident cases caused the General Assembly to abolish the gross negligence standard in guest cases. Virginia Code § 8.01-63. I have no reason to believe that a jury or a court would find it any easier to make the distinction in defamation cases.

I would adopt the *New York Times* standard which permits the recovery of compensatory damages for a defamatory statement only when such statement is made with knowledge that it is false or is made with reckless disregard of whether it was false or not. And I would make the same standard applicable to the media and non-media defendants. Any lesser standard will inevitably have a chilling effect on free speech and the free press and will erode the safeguards protected by the Constitutions of the United States and Virginia.

The majority opinion does limit the application of the negligent standard by requiring a trial judge to find as a matter of law that the defamatory statement "makes substantial danger to reputation apparent." Although I approve the limitation, I fear that it will prove in practice to be one of form rather than substance. What is defamatory and when it is harmful are questions of fact. Judges will be just as hesitant to "take a case away" from the trier of the facts as they now are to set aside the verdict of a jury once it has been rendered.

Because I am of opinion that the defendants in *The Gazette, Inc., Charlottesville Newspapers, Inc.,* and *Port Packet Corporation* were guilty of simple negligence only, a standard which I would not adopt, I dissent from the decision affirming the compensatory-damage awards in the cases. I concur in the action of the majority in reversing the punitive-damage award in the *Port Packet* case. I did not participate in *Fleming.*