**HEISHMAN, INC., Plaintiff,**

v.

**FOX TELEVISION STATIONS, INC., Defendant.**

**No. CIV.A. 02–262–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 20, 2002.

Robert J. Cunningham, Whitestone, Brent, Young and Merril, Fairfax, VA, for Plaintiff.

Dane Hal Butswinkas, Williams & Connolly, Washington, DC, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this removed diversity action, a car dealership sues a television station for defamation based on a broadcast concerning the sale of flood-damaged cars as new or undamaged. Although the dealership is never mentioned in the broadcast, its name appears fleetingly on the license plate frame of one of the cars shown.

At issue is whether summary judgment is warranted where, as here, there is no showing of actual malice, and plaintiff seeks only presumed, not actual damages.

## I.

Plaintiff Heishman, Inc. ("Heishman") is a Virginia automobile dealership specializing in new and used luxury sports automobiles, including Porsches, Audis, and BMWs. Its principal place of business is Arlington, Virginia.

Defendant Fox Television Stations, Inc. ("Fox"), is a Delaware Corporation with its principal place of business in Los Angeles, California. Fox owns and operates "Fox 5," a local television station that broadcasts news and other programs to viewers in the District of Columbia metropolitan area.

The genesis of this defamation action is Fox's February 3, 2000 airing of a ten minute feature story warning viewers about the illegal and fraudulent practice of selling flood-damaged cars to the public as new or undamaged. The feature explained that Hurricane Floyd, four months earlier, had damaged thousands of automobiles, 50,000 in North Carolina alone, and that some Washington metropolitan area dealerships had sold flood-damaged vehicles to unsuspecting consumers who were not aware that the vehicles had been damaged in the floods caused by the hurricane. Included in the broadcast were the stories of two consumers. The first did not purchase a vehicle after he fortunately discovered, independently, that the Lexus he was offered by Nadia Imports at an attractive price had been salvaged after an insurer had declared the vehicle a total loss from flood damages. The second consumer was not so fortunate; he purchased a $33,000 truck from an unnamed dealer, only later to learn that all the problems he was experiencing with the vehicle were likely attributable to the fact, not disclosed to him, that the vehicle had suffered severe flood damage. The broadcast noted that many consumers were being similarly duped by disreputable car dealers. In the end, con-

sumers were given a number of "warning flags" to look for to avoid purchasing a flood-damaged vehicle.

The broadcast never mentioned Heishman by name; nor did it show Heishman's place of business; and no consumer appeared on camera complaining about any negative experiences with Heishman. Only once in the ten minute broadcast was the Heishman name visible to viewers, and then only during a three to four second "pacer,"[1] in which an unidentified man was shown washing a red Porsche. The Porsche had a temporary license plate mounted in a frame bearing the "Heishman" name. While two pacers showed the red Porsche for a total of 12 seconds, the Heishman name on the license plate frame was not visible during the first pacer. During this pacer, when the Heishman name was not visible, the reporter's voice-over was heard to say, "[b]ut too often they are refurbished and resold, only to resurface on the road." In the second pacer, at the instant the image of the Porsche with the visible Heishman name was displayed, the voice-over stated, "[a]nd there's a storm surge of others just like it being cleaned up and prepped to flood the market."

The Porsche in the pacer, in fact, was not a flood-damaged car. Instead, it belonged to the Fox photographer for the broadcast, who had recently purchased it from Heishman. He had filmed himself washing the Porsche in his own driveway, and then provided this video footage to Fox to use as a pacer for the broadcast.

The parties have stipulated certain facts concerning Fox's pre-broadcast review of the feature. Specifically, it is stipulated that the Fox assistant news director and the Fox reporter for the disputed broadcast never discussed mentioning Heishman by name while they were preparing the segment, and that the pacers were not intended to communicate any factual information. It is also undisputed that the feature was reviewed by various Fox employees, including the Fox Vice President and News Director, Fox's assistant news director, and members of Fox's legal department. Thus, once the Fox reporter completed the script, it was reviewed by both the Fox Vice President and the assistant news director. After the feature was completed, with the pacers in place, it was reviewed again by the same parties. Finally, the Fox legal department reviewed the broadcast before it aired. In the course of this multi-layered Fox review process, no one noticed the Heishman name on the license plate frame. This review process was consistent with Fox's standard review procedures for such feature stories.

Significantly, Heishman concedes that it did not suffer any actual damages as a result of the broadcast; it gained rather than lost sales after the feature aired. And, Heishman admits that the broadcast had no effect on the value of its assets or "goodwill," when eleven months later, it sold its assets to AV Automotive, Inc.

In December 2000, Heishman filed a state court defamation action based on the broadcast. In the course of discovery in that case, a $2,000 sanction was imposed on Heishman for failing to provide discovery as required by two court orders. Then, on November 16, 2001, just prior to the scheduled hearing on Fox's motions for summary judgment and for additional discovery sanctions, Heishman nonsuited the

---

1. A "pacer" is a video graphic element that serves as a brief respite from longer periods of a reporter's speaking.

action pursuant to Va Code § 8.01–380.[2]

Thereafter, in March 2002, Heishman re-filed the action in state court, which Fox timely removed to this Court. In the Motion for Judgment which serves as the complaint here, Heishman alleges intentional and negligent defamation on the ground that the broadcast contained allegedly defamatory statements, damaging Heishman's reputation.

Following a denial of Fox's threshold dismissal motion,[3] the parties completed discovery, stipulated certain facts, and now agree that this matter is ripe for summary disposition.[4]

## II.

◼ The starting point in the analysis of the defamation claim is Heishman's concession that it suffered no actual damages as a result of the broadcast, and thus seeks only presumed damages in this case. In Virginia,[5] a private plaintiff may recover presumed compensatory damages resulting from defamation actions regarding matters of public concern[6] only by establishing that the defendant acted with actual malice. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Shenandoah Publishing House v. Gunter,* 245 Va. 320, 427 S.E.2d 370, 372 (1993); *Gazette,* S.E.2d at 724–25. Actual malice requires that the statement be made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Shenandoah,* 427 S.E.2d at 372, quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Heishman concedes it cannot prove "intentional" malice, but instead advances a claim under the "recklessness" prong of the actual malice standard. *See Shenandoah,* 427 S.E.2d at 372.

◼ While noting that "the concept of recklessness cannot be fully encompassed in one infallible definition," the Supreme Court has nonetheless made clear that at a minimum, recklessness requires that a defendant "entertain...serious doubts as to

---

**2.** Va Code § 8.01–380 provides that a party may take one nonsuit as a matter of right for each cause of action or against the same party to a proceeding.

**3.** Fox unsuccessfully sought threshold dismissal of the case on the ground that the broadcast was not "of and concerning" Heishman, as required by Virginia defamation law. *See Gazette, Inc. v. Harris,* 229 Va. 1, 325 S.E.2d 713, 724–25 (1985) (holding that a plaintiff satisfies the " 'of and concerning' test if he shows that the publication would be understood as referring to him by persons reading it who knew him."). The motion failed because a jury could have concluded that the broadcast was "of and concerning" Heishman, given the juxtaposition of the image of the Porsche with the visible Heishman name, and the reporter's voice-over stating, "[a]nd there's a storm surge of others just like it being cleaned up and prepped to flood the market." *See Heishman, Inc. v. Fox Television Stations, Inc.,* Civil Action No. 02–262–A (E.D.Va, March 29, 2002) (Order).

**4.** A market research survey commissioned by Fox to confirm that the fleeting display of Heishman's name had no negative impact on Heishman's reputation is not a part of the summary judgment record.

**5.** Virginia's choice of law rules govern this diversity action. *See Klaxon v. Stentor,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because Virginia applies the *lex loci delicti* rule in tort actions, the parties agree that this defamation action is controlled by Virginia's substantive law. *See Jimenez Puig v. Avis Rent–A–Car System,* 574 F.2d 37, 40 (1st Cir.1978) (the principle of *lex loci delicti* required application of Virginia law because Virginia was the place of the wrong); *McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662, 663 (1979) (same).

**6.** Heishman correctly concedes that the Fox broadcast was a matter of public concern.

the truth of his publication." _Harte–Hanks Communications, Inc. v. Connaughton,_ 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (citing _St. Amant v. Thompson,_ 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)); _Garrison v. Louisiana,_ 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). In other words, "the evidence must establish that the defendant had a high degree of awareness of probable falsity" of the publication. _Harte–Hanks Communications,_ 491 U.S. at 688, 109 S.Ct. 2678. This is a stringent standard, one not easily met by plaintiffs, since a defendant's "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish a reckless disregard for the truth." _Id.; Ryan v. Brooks,_ 634 F.2d 726, 732 (4th Cir.1980). The standard's stringency is also reflected in the fact that plaintiffs must establish recklessness that amounts to actual malice by clear and convincing evidence. _Shenandoah,_ 427 S.E.2d at 372; _Gazette,_ 325 S.E.2d at 727.

 These principles, applied here, are dispositive. Thus, it is clear that the undisputed summary judgment record reveals no evidence that Fox's employees "had a high degree of awareness of [the] probable falsity" of anything in the broadcast relating to Heishman. _Garrison,_ 379 U.S. at 74, 85 S.Ct. 209. To the contrary, the record reveals that none of Fox's reviewers were even aware that Heishman's name appeared in the feature.[7] Also significant is that Fox subjected the broadcast to its standard mul-

tiple review process, including review by its legal department. Simply put, Heishman has produced no evidence that Fox engaged in any conduct that can fairly be said to evince a "reckless disregard for the truth." _Shenandoah,_ 427 S.E.2d at 372.

Oddly, Heishman argues that Fox's standard use of multiple reviewers-five in this case-all of whom missed Heishman's name on the license plate holder, is evidence of Fox's recklessness that equates to actual malice. According to Heishman, had there been only one or two reviewers, Fox's conduct would reflect negligence, not recklessness; but, the fact that there were five reviewers who missed the visual reference to Heishman is, according to Heishman, _prima facie_ recklessness. This argument is meritless; it wrongly equates efforts to exercise due care with recklessness merely because the efforts do not succeed. Anomalously, Heishman's argument, if accepted, would discourage efforts to exercise due care through the use of multiple reviewers.

In sum, the record is completely devoid of any evidence of a triable issue of fact as to malice or recklessness on Fox's part. Given this, and because a showing of malice is a prerequisite in Virginia to recover presumed damages for defamation, Fox is entitled to summary judgment.[8]

An appropriate Order will issue.

---

7. This fact sharply distinguishes this case from the examples of recklessness provided by the Supreme Court, which include: "intentional fabrication by a defendant of facts or communications; basing an article wholly upon an unverified anonymous telephone call; printing allegations so inherently improbable that only a reckless person would put them in

circulation; and publication of an article despite obvious reasons to doubt the truth and veracity of the informant upon whom the article relies for accuracy." _St. Amant,_ 390 U.S. at 732, 88 S.Ct. 1323.

8. This result makes it unnecessary to reach Heishman's claim of negligent defamation. While that claim does not require a showing

of malice, it is available only where actual damages are sought, which is not the case here. *Shenandoah,* 427 S.E.2d at 372; *Gazette,* 325 S.E.2d at 725 (holding that a plaintiff may recover presumed damages only upon clear and convincing proof of actual malice); *Newspaper Publishing Corp. v. Burke,* 216 Va. 800, 224 S.E.2d 132, 135 (1976). In any event, even assuming that Heishman were to seek actual damages, this claim would fail because recovery for negligent defamation under Virginia law is limited to circumstances where the statement "makes substantial danger to reputation apparent" from the broadcast. *WJLA–TV v. Levin,* 264 Va. 140, 564 S.E.2d 383, 391 (2002); *Gazette,* 325 S.E.2d at 725; *Burke,* 224 S.E.2d at 134. Thus, there is no claim for negligent defamation unless "viewing the circumstances objectively, a reasonable and prudent editor should have anticipated that the words used contained an imputation necessarily harmful to reputation." *Gazette,* 325 S.E.2d at 733. This determination must be made by the trial judge as a matter of law, taking into consideration the allegedly defamatory publication as a whole. *Id.; see also Ramey v. Kingsport Publishing Corp.,* 905 F.Supp. 355 (1995). In the circumstances, the broadcast taken as a whole cannot fairly be said to pose a substantial danger to Heishman's reputation.